**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LATERRIA SMITH, as the Independent Administrator of the ESTATE OF JAYDEN D. PERKINS, Deceased, LATERRIA SMITH, Individually, and LATERRIA SMITH, Mother and Next of Kin of KAMERON MILES, a Minor, | |
| Plaintiffs, | Case No. 1:25-cv-04279 |
| v. | |
| CITY OF CHICAGO, LATOYA HUGHES, Acting Director of the Illinois Department of Corrections, DONALD SHELTON, Former Chair of the Illinois Prisoner Review Board, and LEANN MILLER, Former Member of the Illinois Prisoner Review Board, | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

NOW COME Plaintiffs, Laterria Smith, as the Independent Administrator of the ESTATE OF JAYDEN D. PERKINS, LATERRIA SMITH, in her individual capacity, and Laterria Smith, Mother and Next of Kin of KAMERON MILES, a Minor, by and through OTUBUSIN & OTUBUSIN, for their First Amended Complaint against Defendants the CITY OF CHICAGO, LATOYA HUGHES, Acting Director of the Illinois Department of Corrections, DONALD SHELTON, Former Chair of the Illinois Prisoner Review Board, and LEANN MILLER, Former Member of the Illinois Prisoner Review Board, allege as follows:

## NATURE OF THE CASE

1.     This action seeks to hold Defendants the CITY OF CHICAGO, LATOYA HUGHES, Acting Director of the Illinois Department of Corrections, DONALD SHELTON, Former Chair of the Illinois Prisoner Review Board, and LEANN MILLER, Former Member of the Illinois Prisoner Review Board, accountable for their willful and wanton misconduct

and violations of federal civil rights law under 42 U.S.C. § 1983 that directly caused the preventable murder of 11-year-old JAYDEN PERKINS, the near-fatal stabbing of his mother LATERRIA SMITH, and severe emotional trauma to his 5-year-old brother KAMERON MILES.

2. Each Defendant had actual knowledge of the escalating threats posed by Crosetti Brand, a violent repeat offender with an extensive history of domestic violence, and failed to take reasonable steps to protect this family, demonstrating deliberate indifference to their safety and constitutional rights.

3. Specifically, Miller participated in granting Brand parole despite clear evidence he posed an imminent danger to Smith and her children; Shelton, as Chair of IPRB, failed to exercise adequate oversight over the reckless parole decision and allowed a culture of dangerous incompetence to persist under his leadership; Hughes, as acting director of IDOC, failed in her supervisory duties to monitor Brand, disregarded his repeated parole violations, and ignored his escalating threats; and the City of Chicago maintained policies and customs that systematically failed to protect domestic violence victims, with officers refusing to act on Smith's reports of Brand's violations and threats.

4. Defendants' collective deliberate indifference, reckless decisions, and constitutional violations created the conditions that enabled Brand's fatal attack on March 13, 2024, resulting in Jayden's death, Smith's severe injuries, and lasting trauma to Kameron.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

6.     This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy as the federal claims.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and all Defendants reside in, conduct business in, or are government agencies operating within this District.

## PARTIES

8.     Plaintiff ESTATE OF JAYDEN PERKINS is the legal representative of Jayden Perkins, an 11-year-old child who was murdered on March 13, 2024, as a direct result of Defendants' willful and wanton misconduct.

9.     Plaintiff LATERRIA SMITH is the mother of Jayden Perkins and Kameron Miles, and a resident of Cook County, Illinois. She was severely injured in the same attack and continues to suffer immense physical pain, psychological trauma, and irreparable loss.

10.    Plaintiff KAMERON MILES is a minor and the surviving son of Laterria Smith. At five years old, he witnessed the murder of his brother and the near-fatal attack on his mother, resulting in psychological trauma.

11.    Defendant CITY OF CHICAGO is a municipal corporation organized under Illinois law. The City is sued for the actions, policies, and customs of its police department and other municipal agents that failed to protect domestic violence victims, including the failure to arrest Brand despite knowledge of his threats and violations.

12.    Defendant LATOYA HUGHES is sued in her individual capacity. At all relevant times, Hughes served as the Acting Director of the Illinois Department of Corrections (IDOC),

overseeing the supervision of parolees, including Crosetti Brand. Hughes is alleged to have failed to ensure appropriate monitoring and intervention to prevent violations and threats, demonstrating deliberate indifference to known risks.

13. Defendant DONALD SHELTON is sued in his individual capacity. At all relevant times, Miller served as Chair of the Illinois Prisoner Review Board (IPRB), with ultimate supervisory authority over parole decisions and IPRB operations. Shelton is alleged to have failed to adequately train, supervise, and discipline IPRB members, demonstrating deliberate indifference to known risks. Shelton resigned from the IPRB after the events giving rise to this Complaint.

14. Defendant LEANN MILLER is sued in her individual capacity. At all relevant times, Miller served as a Member of the Illinois Prisoner Review Board (IPRB) and conducted Brand's parole hearing. Miller is alleged to have recommended Brand's release despite knowledge of his violent history and threats, demonstrating deliberate indifference to victim safety. Miller resigned from the IPRB after the events giving rise to this Complaint.

## FACTUAL ALLEGATIONS

15. Crosetti Brand was a convicted violent offender with a long, well-documented history of domestic violence, aggravated battery, home invasion, and repeated violations of protective orders. Law enforcement, parole officials, and public records all were warned of his escalating threats toward Laterria Smith.

16. Smith first met Brand when she was a 15-year-old high school student, and they began dating. After Smith ended the relationship, Brand engaged in escalating acts of intimidation and violence, including firing a gun outside her home, throwing rocks at her residence, and

physically attacking her. As a result of this conduct, Smith obtained an order of protection against him.

17. Brand's criminal record included multiple convictions for battering Smith, threatening her and her mother, and violating orders of protection. He had also been convicted of battering other women. Since age 18, Brand spent all but 344 days either in prison or facing pending charges, mostly for domestic-related cases.

18. In November 2015, Brand was sentenced to 16 years in prison for attacking another woman who had recently ended a relationship with him. He was released in October 2023 after serving 8 years. As a condition of his parole, Brand was subject to a "No Victim Contact" order prohibiting contact with Smith.

19. In the months leading up to the attack, Brand sent multiple threats to Smith via text, social media, and in person, which she reported to law enforcement authorities and his parole officer.

20. On February 1, 2024, Brand arrived uninvited at Smith's home, where Jayden and Kameron resided, attempting to force his way inside—a direct violation of his parole conditions.

    a. Smith called Brand's parole officer through the monitoring service (AMS) to report that Brand was at her door stalking her. Commander DeYoung returned her call, and she identified herself as a known victim of Brand and reported that he was at her address ringing the door bell and pulling on the door handle.

    b. Commander DeYoung contacted Brand about the incident and Brand admitted being at Smith's address but falsely claimed he was "looking for a new apartment." Brand turned himself in to the parole office that same day. A diversion review was conducted, and diversion was denied.

c. This violation was formally documented by IDOC in an official Parole Violation Report dated February 4, 2024, which recorded Brand's violation of "No Victim Contact Order, stalking a known victim [Laterria]."

d. Brand was also cited for failing to allow agent visits, failing to comply with required programming and residential placement, and changing his residence or employment without permission.

e. The Parole Violation Report further documented that Brand had interfered with his GPS monitoring. Just one day after being placed on GPS monitoring, Agent Gardner was notified by AMS of a "Beacon Power Loss Violation" when Brand's GPS device lost power. When contacted, Brand claimed "that the box was unplugged accidently and is now plugged up."

21. IDOC's own records, including the Parole Violation Report dated February 4, 2024, documented Brand's violations of his "No Victim Contact" order, his interference with GPS monitoring, and his admission to being at Smith's address, all of which should have been known to IDOC and its leadership, including Acting Director Hughes.

22. Smith also contacted law enforcement to report Brand violating his parole conditions, stalking her, harassing her, and attempting to break into her home, but the officers refused to take a formal report or arrest Brand, instead telling Smith to go to court for a protective order.

23. Smith did as instructed, went to court, and testified that Brand had threatened her via text messages on January 30, 2024, and had come to her apartment on February 1, 2024. The Court declined to grant an emergency order of protection because Brand was in custody at

the time, and instead scheduled a full hearing for March 13, 2024—the morning of the attack.

24.     On February 26, 2024, Miller convened a parole violation hearing for Brand. Despite being the reporting victim, Smith was not permitted to testify, nor did the Board hear from any independent witnesses. The only live evidence presented was Brand's own testimony and arguments by counsel.

   a.  Miller had the Parole Violation Report documenting Brand's admission to Commander DeYoung that he was at Smith's residence. However, Miller did not consider AMS records and disregarded Brand's prior admission. Brand predictably denied the violation at the hearing, and Miller accepted his denial.

   b.  Miller did find that Brand violated other conditions of release—including failing to allow agent visits, failing to comply with required programming and residential placement, and changing his residence or employment without permission.

   c.  In an order signed by Miller, the Board concluded that "preponderance not met on the [2/1/24] incident with no victim," thereby disregarding Brand's prior admission and Smith's report.

   d.  Miller ordered Brand's parole to be resumed.

25.     After being released from incarceration at 6:08 p.m. on March 12, 2024, Brand immediately targeted Smith. Just nine minutes later, at 6:17 p.m., he began a series of back-to-back calls to Smith from a blocked number.

26.     Hughes, as Acting Director of IDOC, failed to ensure Smith was notified of Brand's release despite the documented threats and violations until after these calls began, forcing her to ask her family for extra security.

27. At 9:49 p.m. that night, Brand called an Uber to Smith's apartment building, arriving at her home at 10:10 p.m. Rather than confront her immediately, Brand lay in wait overnight, knowing Smith would eventually open the door to take her sons to school. The stabbing occurred the next morning, March 13, 2024.

28. On March 13, 2024, Brand forced his way into Smith's home, stabbed her multiple times, and murdered her 11-year-old son, Jayden, in front of his younger brother, Kameron.

29. The failures of Defendants to protect Plaintiffs from the foreseeable and imminent danger posed by Brand were direct, substantial factors in this tragedy. Each Defendant had actual knowledge of the extreme risk, possessed the authority to intervene, and deliberately failed to act, thereby causing the injuries and deaths complained of herein.

    a. Defendant City of Chicago, through its policies, customs, and practices, failed to adequately protect domestic violence victims. Despite Smith's reports of Brand's parole violations, stalking, harassment, and attempts to break into her home, officers refused to take formal reports or arrest Brand, instead directing Smith to seek her own protective order.

        i. This pattern of inaction, despite clear probable cause and imminent risk, reflects the City's deliberate indifference to the safety of domestic violence victims and demonstrates willful and wanton disregard for the known and escalating danger posed by offenders like Brand.

    b. Defendant Hughes, in her individual capacity as Acting Director of IDOC, had direct supervisory authority over Brand's parole and the systems designed to monitor high-risk offenders. Despite actual knowledge of Brand's documented parole violations, including his admission to being at Smith's address, GPS

tampering, and attempts to force entry into Smith's home as detailed in the February 4, 2024 Parole Violation Report, Hughes failed to ensure adequate supervision, failed to revoke Brand's parole or detain him in response to these clear violations, and failed to implement corrective action or increased supervision.

    i. Hughes's deliberate indifference to the known and escalating danger Brand posed to Plaintiffs, combined with her failure to act on documented violations within her authority, directly contributed to enabling Brand's continued access to the victims.

c. Defendant Shelton, in his individual capacity as former Chair of the IPRB, had ultimate supervisory authority over parole decisions and the systems responsible for monitoring high-risk offenders, including Crosetti Brand. Despite actual knowledge of Brand's extensive history of violent domestic abuse, aggravated battery, home invasion, repeated violations of protective orders and parole conditions, and specific threats against Smith, Shelton failed to exercise adequate oversight over the parole decision-making process. His failure to train, supervise, and discipline IPRB members, including Defendant Miller, allowed a culture of dangerous incompetence and indifference to persist within the organization he led.

    i. By failing to intervene despite his knowledge and authority, Shelton directly contributed to the reckless parole decision that placed Plaintiffs in foreseeable and imminent danger.

d. Defendant Miller, in her individual capacity as the IPRB member who personally conducted Brand's parole hearing, had direct knowledge of his documented history of violent domestic abuse, aggravated battery, home invasion, repeated violations

of protective orders, and specific threats against Smith. Despite this knowledge and the existence of the Parole Violation Report documenting Brand's admission to being at Smith's address and GPS tampering, Miller recommended Brand's release without requiring victim input, without imposing meaningful safeguards, and while accepting Brand's denials of wrongdoing.

    i. Miller's conduct demonstrated deliberate indifference to victim safety and created a foreseeable risk of harm to Plaintiffs by enabling Brand's release despite clear warning signs.

30. The media reported extensively on the case, highlighting the systemic failures that led to Brand's release and the lack of enforcement of legal protections:

    a. Major outlets reported Brand was released from prison on parole just before the attack, and that Smith had an active order protecting her.

    b. Reports noted Brand had previously violated protection orders multiple times and threatened Smith while on parole.

    c. Top officials, including the Governor, State's Attorney, and CPD Superintendent, publicly questioned why Brand was released despite his record of domestic abuse and repeated violations.

31. CPD Superintendent Larry Snelling publicly stated the violent attack "should not have happened," emphasizing that Brand had "three orders of protection violations against him" and had been released on parole the day before the attack, while "still serving a 16-year sentence for home invasion where he caused injury."

32. Public outrage over the case led to the resignation of IPRB Chair Defendant Shelton and IPRB Member Defendant Miller. Governor JB Pritzker acknowledged that evidence in the case was not given the careful consideration domestic violence victims deserve.

33. In direct response to Jayden's murder and the systemic failures highlighted by this case, the Illinois General Assembly passed, and Governor Pritzker signed, Senate Bill 19 (Public Act 104-0011, eff. 2025). SB 19:

    a. Expands victims' rights to participate in parole hearings and submit impact statements;

    b. Requires the PRB to provide victims with additional notice and resources;

    c. Creates the Office of the Director of Victim and Witness Services within the PRB;

    d. Mandates that more board members have relevant law enforcement or judicial experience; and

    e. Increases board member terms to promote professionalism and accountability.

34. The legislative record and public statements confirm that Jayden's case was the catalyst for these reforms, and the statute itself is a recognition by the State of Illinois that the previous system failed to protect victims and the public.

35. On August 5, 2025, Brand was convicted and sentenced to natural life in prison for the first-degree murder of Jayden, a consecutive 60-year sentence for attempted murder and aggravated domestic battery of Smith, and a consecutive 60-year sentence for home invasion.

36. The failures in this case are not isolated. The pattern of inadequate response to domestic violence threats and failure to enforce parole conditions, as demonstrated by the actions and inactions of Defendants has resulted in repeated, preventable tragedies.

37.     Defendants' decisions and failures to act were not mere negligence—they constituted willful and wanton misconduct under Illinois law. Specifically, the deliberate indifference and conscious disregard for the known and escalating risks by Defendants the City of Chicago, Hughes, Shelton, and Miller, as detailed herein, directly caused the wrongful death of Jayden, the life-threatening injuries to Smith, and the lasting trauma to Kameron.

**COUNT I**
**42 U.S.C. §1983 – State-Created Danger**
**Against the City of Chicago**

38.     Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

39.     To state a claim for state-created danger under the Fourteenth Amendment, Plaintiffs must show: (1) the defendant took affirmative acts that created or increased a danger the victim would not have otherwise faced; (2) the defendant acted with deliberate indifference to a known, substantial risk of serious harm; (3) the conduct was conscience-shocking; and (4) the conduct was a proximate cause of the harm suffered.

40.     At all relevant times, the City of Chicago was responsible for establishing, implementing, and overseeing the policies, training, and supervision of the CPD.

41.     The City of Chicago, through its police officers, affirmatively increased the danger to Plaintiffs by refusing to arrest Brand despite clear probable cause and legal authority to do so.

42.     The City, through CPD, had actual and constructive knowledge of the substantial risk Brand posed, including:

        a.  Brand's extensive history of domestic violence against Smith, including multiple domestic violence convictions and repeated violations of protective orders;

    b.   Smith's direct reports of escalating threats, stalking, and Brand's attempted forced entry into her home on February 1, 2024, where her children resided;

    c.   Evidence that Brand was violating his "No Victim Contact" parole condition through continued stalking and harassment; and

    d.   Law enforcement knowledge, consistent with best practices, that such parole and protective-order violations represent an elevated risk of lethal violence.

43.    Despite this knowledge, CPD officers affirmatively chose not to arrest Brand for trespass, harassment, or stalking, but instead directed Smith to "go to court," abandoning their responsibility to intervene.

44.    This deliberate refusal to act—despite probable cause and the means to detain Brand—enabled him to remain at large, escalate his stalking, and develop an increased sense of impunity, thereby heightening the danger to Plaintiffs.

45.    CPD officers knew or should have known that their refusal to arrest Brand created a direct and foreseeable risk not only to Smith, but also to her minor children, Jayden and Kameron, who lived at the address Brand repeatedly targeted.

46.    The City's conduct was conscience-shocking, reflecting a complete abdication of responsibility to protect known victims from imminent harm. This is further underscored by CPD Superintendent Larry Snelling's public acknowledgment that the attack "should not have happened" given Brand's history and parole status.

47.    The City's actions were not isolated; they reflect a broader pattern of CPD's inadequate response to domestic violence cases, which has resulted in other preventable homicides.

48.  The City's deliberate decision to leave Brand free was a proximate cause of the harm suffered by Plaintiffs. Had CPD arrested Brand on February 1, 2024, he would have been detained and prevented from carrying out the fatal March 13, 2024 attack.

49.  As a direct and proximate result of the City's state-created danger, Plaintiffs' substantive due process rights under the Fourteenth Amendment were violated, resulting in Jayden's death, Smith's life-threatening injuries, and Kameron's severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant CITY OF CHICAGO in an amount in excess of $75,000, plus costs, attorney's fees pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

### COUNT II
### 42 U.S.C. §1983 – Monell Liability
### Against the City of Chicago

50.  Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

51.  To establish municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), Plaintiffs must show: (1) a constitutional violation; (2) caused by a municipal policy, custom, or practice; (3) maintained with deliberate indifference to constitutional rights; and (4) that was the moving force behind the violation.

52.  At all relevant times, the City of Chicago was responsible for establishing, implementing, and overseeing the policies, training, and supervision of the CPD.

53.  As alleged, Plaintiffs suffered violations of their Fourteenth Amendment substantive due process rights when the City of Chicago, through its police department, created or increased the danger posed by Brand and failed to protect them from imminent harm.

54. These violations resulted in the wrongful death of Jayden, life-threatening injuries to Laterria, and severe psychological trauma to Kameron.

55. The City of Chicago, through the CPD, maintained an ongoing policy, custom, or practice of failing to respond adequately to domestic violence threats, failing to investigate and act on credible reports of harassment and stalking, and failing to take reasonable steps to protect known victims and their families.

56. This unconstitutional policy, custom, or practice is evidenced by CPD's pattern of conduct, including but not limited to:

   a. Routinely failing to arrest or detain individuals credibly accused of domestic violence, stalking, or threats, even when presented with clear evidence and imminent danger;

   b. Prematurely closing or suspending domestic violence cases without proper investigation, even when victims provided documentation, photographs, or video evidence;

   c. Deflecting responsibility by instructing victims to seek their own arrest warrants or protective orders rather than taking enforcement action;

   d. Failing to coordinate with parole and supervising agencies to monitor and respond to high-risk offenders; and

   e. Providing inadequate training and supervision of officers regarding domestic violence response and constitutional obligations to protect victims from known threats.

57. This policy, custom, or practice is further demonstrated by multiple documented homicides of domestic-violence victims where CPD ignored escalating threats, including:

a. Maria Roque (2023): Despite repeated reports and clear evidence of escalating threats, harassment, and violence by her former boyfriend, CPD closed or suspended her cases and failed to arrest the perpetrator for repeated violations. Roque was ultimately shot and killed in front of her children.

b. Karina Gonzalez (2023): Two weeks before she was fatally shot in her home, Gonzalez reported to CPD that her husband had threatened to kill her. CPD failed to take the report seriously. Gonzalez—and her teenage daughter—were ultimately shot and killed.

c. Lacramioara Beldie (2024): Despite prior charges of aggravated domestic battery and attempted kidnapping supported by witness and video evidence, CPD failed to enforce protections, and Beldie was fatally stabbed by her estranged husband.

58. The City maintained this policy, custom, or practice with deliberate indifference to the constitutional rights and safety of domestic violence victims, despite clear notice of systemic failures through lawsuits, media reports, advocacy warnings, DOJ investigations, and the recurring pattern of preventable domestic-violence homicides.

59. Despite this notice, the City failed to implement meaningful reforms, training, or supervision, and continued to adhere to deficient practices, demonstrating deliberate indifference to the safety of victims.

60. The City's policy, custom, or practice was the moving force behind the constitutional violations in this case. CPD officers, acting pursuant to this policy, failed to arrest Brand after his attempted forced entry on February 1, 2024, despite probable cause and knowledge that domestic abusers frequently target children as well as their primary victims.

61.     Instead of intervening, CPD instructed Smith to seek a protective order herself and failed to document the incident or coordinate with IDOC regarding Brand's parole violations.

62.     This failure to act—consistent with the City's established patterns and practices—directly enabled Brand's continued freedom, escalating violence, and eventual attack on March 13, 2024.

63.     But for the City's unconstitutional policy, custom, or practice, Brand would have been arrested and detained on February 1, 2024, preventing the fatal and life-altering harm suffered by Plaintiffs.

64.     As a direct and proximate result of the City's *Monell* violations, Plaintiffs' substantive due process rights were violated, resulting in Jayden's death, Smith's severe injuries, and Kameron's lasting psychological trauma.

        WHEREFORE, Plaintiffs demand judgment against Defendant CITY OF CHICAGO in an amount in excess of $75,000, plus costs, attorney's fees under 42 U.S.C. § 1988, and all other relief this Court deems just and proper.

### COUNT III
### Willful and Wanton Misconduct
### Against the City of Chicago

65.     Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

66.     Under Illinois law, willful and wanton misconduct is conduct that either (a) reflects an actual or deliberate intent to cause harm, or (b) demonstrates an utter indifference to, or conscious disregard for, the safety of others. A municipality may be liable where its policies, customs, practices, or agents' actions reflect such disregard and are a proximate cause of the injuries alleged.

67. At all relevant times, the City of Chicago was responsible for establishing, implementing, and overseeing the policies, training, and supervision of the CPD.

68. The City owed Plaintiffs a duty to exercise reasonable care in developing and enforcing policies and practices concerning domestic violence response, protection of known victims, and prevention of foreseeable harm.

69. The City had actual and constructive knowledge that:

    a. CPD officers routinely failed to respond to credible domestic-violence threats, investigate complaints, or arrest individuals for stalking, harassment, trespass, or other criminal conduct, even when presented with clear evidence and repeated warnings;

    b. There was a longstanding pattern of inadequate response and non-enforcement of court orders, documented in lawsuits, media coverage, and public reports;

    c. City policies and practices did not require CPD officers to take protective action despite imminent and specific dangers; and

    d. Despite repeated warnings, the City failed to implement meaningful reforms.

70. Despite this knowledge, the City:

    a. Maintained policies, practices, and customs that permitted CPD officers to ignore probable cause for arrests in domestic violence cases;

    b. Failed to provide adequate training and supervision to ensure officers responded appropriately to stalking, harassment, trespass, and parole violations;

    c. Failed to discipline officers who neglected credible threats or refused to take protective action; and

    d. Allowed a pattern of non-enforcement and inadequate response to persist.

71.    The City's conduct reflected a conscious disregard for the safety of Plaintiffs and other domestic violence victims, as shown by:

    a.    CPD's refusal to arrest Brand despite repeated parole violations, knowledge of his violent history, and reports of threats, harassment, stalking, and attempting to break into her home by Smith;

    b.    Officers instructing Smith to seek her own protective order even after Brand attempted to force entry into her home;

    c.    CPD's failure to coordinate with IDOC or other agencies regarding Brand's escalating violations; and

    d.    The City's maintenance of a systemic policy of non-enforcement that enabled Brand's continued access to Smith and her children.

72.    The City's willful and wanton misconduct was a direct and proximate cause of Jayden's death, Smith's life-threatening injuries, and Kameron's severe psychological trauma.

    WHEREFORE, Plaintiffs demand judgment against Defendant CITY OF CHICAGO in an amount in excess of $75,000, plus costs, and for all other relief this Court deems just and proper.

**COUNT IV**
**Wrongful Death – 740 ILCS 180/1 et seq.**
**Against the City of Chicago**

73.    Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

74.    At all relevant times, the City of Chicago was responsible for establishing, implementing, and overseeing the policies, training, and supervision of the CPD.

75.    The City owed a duty of care not only to Smith, but also to all persons it knew or should have known were foreseeably at risk from Brand's conduct—including Smith's minor children, such as Jayden, who resided with her at the address Brand repeatedly targeted.

76.    The City, through CPD, was on notice that domestic violence perpetrators frequently target children and other family members to inflict maximum harm on their primary victims.

77.    The City, through its officers and agents, had actual and constructive knowledge that:

   a.    Brand had a documented history of violent domestic abuse, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions, including threats and violence directed at Smith where her children lived;

   b.    On February 1, 2024, Brand arrived uninvited at Smith's home and attempted to force his way inside—a direct parole violation—while her children resided there;

   c.    Smith reported Brand's stalking, harassment, and parole violations to CPD, but officers refused to take a formal report or arrest him, instead telling Smith to seek a protective order;

   d.    IDOC's Parole Violation Report documented Brand's violation as "stalking a known victim [Laterria]" and recorded his admission to being at her residence;

   e.    CPD officers knew Brand was a convicted violent felon on parole, subject to a "No Victim Contact" condition, and violating that order;

   f.    CPD officers also knew that children in Smith's home were at foreseeable risk; and

   g.    The City's policies and practices failed to ensure officers acted to protect victims and their children despite knowledge of imminent danger.

78.    Despite this knowledge, the City breached its duty of care by:

    a. Maintaining policies and practices that did not require officers to arrest individuals for criminal conduct against domestic violence victims, even when probable cause existed;

    b. Failing to provide adequate training and supervision to ensure appropriate responses to domestic violence, stalking, trespass, and parole violations;

    c. Failing to discipline officers who ignored credible threats or refused to act;

    d. Allowing a pattern of non-enforcement and inadequate response to persist;

    e. Refusing to arrest Brand for trespass, attempted burglary, stalking, and parole violations on February 1, 2024, despite clear probable cause and imminent risk; and

    f. Failing to coordinate with IDOC or other agencies to monitor and respond to Brand's escalating conduct.

79. The City knew or should have known that its failure to implement and enforce reasonable protective policies created a foreseeable risk of harm not only to Smith, but also to her children, including Jayden.

80. As a direct and proximate result of the City's wrongful acts, neglect, and breaches of duty, Jayden was fatally stabbed on March 13, 2024.

81. As a further direct and proximate result, Jayden's next of kin—including Smith and Kameron—suffered pecuniary injuries, including loss of support, companionship, grief, sorrow, mental suffering, and funeral and burial expenses.

WHEREFORE, Plaintiff Laterria Smith, as Independent Administrator of the Estate of Jayden Perkins, demands judgment against Defendant CITY OF CHICAGO in an amount in excess of $75,000, plus costs, and for all other relief this Court deems just and proper.

**COUNT V**
**Survival Action – 755 ILCS 5/27-6**
**Against the City of Chicago**

82.    Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set
       forth herein.

83.    At all relevant times, the City of Chicago was responsible for establishing, implementing,
       and overseeing the policies, training, and supervision of the CPD.

84.    The City owed a duty of care not only to Smith, but also to all persons it knew or should
       have known were foreseeably at risk from Brand's conduct—including Smith's children,
       such as Jayden, who resided with her at the address Brand repeatedly targeted.

85.    The City, through its officers, had actual and constructive knowledge that:

       a.   Brand had a long history of violent domestic abuse, aggravated battery, home
            invasion, and repeated violations of protective orders and parole conditions,
            including violence against Smith at her residence;

       b.   On February 1, 2024, Brand attempted to force entry into Smith's home while
            Jayden and Kameron resided there, in direct violation of parole;

       c.   Smith reported these threats and violations to CPD, but officers refused to arrest
            Brand or even take a formal report, instead instructing her to seek a protective order;

       d.   IDOC's Parole Violation Report documented Brand's violation as "stalking a
            known victim [Laterria]" and recorded his admission to being at her address;

       e.   CPD officers knew Brand was a violent parolee bound by a "No Victim Contact"
            order and was actively violating it;

       f.   CPD officers knew that Smith's children were at heightened risk; and

      g.  The City's policies and practices failed to require officers to act on such imminent and specific dangers.

86.   Despite this knowledge, the City breached its duty of care by:

      a.  Maintaining policies and practices that did not require arrest of offenders in domestic violence cases despite probable cause;

      b.  Failing to adequately train and supervise officers to respond appropriately to stalking, harassment, trespass, and parole violations;

      c.  Failing to discipline officers who ignored credible threats or refused to act;

      d.  Allowing a persistent pattern of non-enforcement;

      e.  Refusing to arrest Brand on February 1, 2024, despite probable cause and imminent risk; and

      f.  Failing to coordinate with IDOC or other agencies to monitor Brand's escalating threats.

87.   The City knew or should have known that these systemic failures created a foreseeable risk of harm not only to Smith, but also to Jayden.

88.   As a direct and proximate result of the City's wrongful acts and omissions, Jayden suffered conscious pain, terror, and emotional distress before his death on March 13, 2024.

89.   Jayden's Estate is entitled to all damages permitted under the Illinois Survival Act, including compensation for pain and suffering, emotional distress, loss of life and opportunities, medical expenses, and funeral and burial costs.

WHEREFORE, Plaintiff Laterria Smith, as Independent Administrator of the Estate of Jayden Perkins, demands judgment against Defendant CITY OF CHICAGO in an amount in excess of $75,000, plus costs, and for all other relief this Court deems just and proper.

**COUNT VI**
**42 U.S.C. § 1983 – Supervisory Liability**
**<u>Against LaToya Hughes, in Her Individual Capacity</u>**

90.     Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

91.     Under 42 U.S.C. § 1983, supervisory liability may be imposed where a supervisor's own actions or inactions were the moving force behind a constitutional violation. Liability arises when the supervisor either: (a) directly participated in the violation; or (b) had actual or constructive knowledge of a pattern of unconstitutional conduct by subordinates and demonstrated deliberate indifference through acquiescence, tacit approval, or failure to act.

92.     At all relevant times, Hughes served as Acting Director of the IDOC, acting under color of state law. In that role, she held ultimate supervisory authority over parole officers and the systems responsible for monitoring parolees, including Brand.

93.     Hughes had actual and constructive knowledge that IDOC staff were failing to monitor and enforce parole conditions. This knowledge came from:

   a.   Documented parole violations by Brand, including interference with GPS monitoring;

   b.   Brand's admission that he was at Smith's residence, as documented in the February 4, 2024 Parole Violation Report; and

   c.   Repeated warnings that Brand posed an imminent threat to Smith and her children.

94.     Hughes was aware of a broader pattern of IDOC parole officers failing to respond to violations—including Brand's repeated contact with Smith in violation of his "No Victim Contact" order—and failing to coordinate with law enforcement or the Prisoner Review Board to ensure enforcement.

95.     Hughes also knew or should have known that IDOC staff were not adequately trained or supervised to recognize and respond to escalating threats, parole violations, and high-risk domestic violence cases.

96.     Despite this knowledge, Hughes failed to implement or enforce adequate policies, training, or supervision to ensure that:

    a.  Parole officers conducted meaningful risk assessments and responded to violations;

    b.  Reports of threats, stalking, and parole violations were promptly investigated and acted upon;

    c.  Parole was revoked or modified for repeat violators and high-risk offenders like Brand; and

    d.  Coordination occurred with law enforcement and the parole board to protect known victims.

97.     Hughes further failed to discipline or retrain IDOC staff who ignored parole violations, disregarded credible threats, or neglected to enforce conditions of release, thereby fostering a culture of indifference to victim safety.

98.     These supervisory failures directly impacted the handling of Brand's case, including Hughes's failure to ensure consequences for documented GPS tampering, Brand's admission to being at Smith's residence, and the failure to notify Smith of Brand's release until after he began contacting her.

99.     Hughes's deliberate indifference to these systemic failures was a moving force behind the constitutional injuries suffered by Plaintiffs. Her failure to supervise, train, and discipline IDOC staff enabled Brand to repeatedly violate parole, escalate his threats, and ultimately attack Smith and her children.

100. Hughes knew or should have known that her supervisory failures created a direct and foreseeable risk of harm not only to Smith, but also to her minor children residing with her.

101. Hughes's conduct was not mere negligence but a conscious disregard for Plaintiffs' constitutional rights and safety, constituting a violation of their substantive due process rights under the Fourteenth Amendment.

102. Hughes's supervisory failures were a substantial factor in causing the constitutional deprivations that resulted in Jayden's death, Smith's life-threatening injuries, and Kameron's severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LATOYA HUGHES, in her individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, attorney's fees pursuant to 42 U.S.C. § 1988, and all other relief this Court deems just and proper.

**COUNT VII**
**42 U.S.C. §1983 – Failure to Protect**
**Against LaToya Hughes, in Her Individual Capacity**

103. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

104. Under the Fourteenth Amendment's Due Process Clause, liability under 42 U.S.C. § 1983 arises when state actors: (a) have actual knowledge of a substantial risk of serious harm to a specific individual; (b) possess the authority and opportunity to act; (c) act with deliberate indifference by consciously disregarding that risk; and (d) whose deliberate indifference is a substantial factor in causing the constitutional deprivation. Liability also attaches when state actors affirmatively create or increase the danger, or when a special relationship imposes a duty to protect.

105. At all relevant times, Hughes served as Acting Director of the IDOC, acting under color of state law. In that role, she held ultimate supervisory authority over parole officers and the systems responsible for monitoring parolees, including Brand.

106. By assuming supervisory authority over Brand's parole, the State of Illinois—acting through Hughes—created a special relationship with Plaintiffs and assumed a duty to protect them from the known dangers Brand posed. Alternatively, Hughes's failure to ensure adequate supervision and enforcement affirmatively created or increased the danger by allowing a violent offender to remain free despite documented violations.

107. Hughes had actual and constructive knowledge that IDOC staff were failing to monitor and enforce parole conditions for high-risk offenders. This knowledge stemmed from:

   a. Documented parole violations by Brand, including GPS interference and his admission to being at Smith's home, as detailed in the February 4, 2024 Parole Violation Report;

   b. Repeated warnings identifying Brand as an ongoing and imminent threat to Smith and her children;

   c. Brand's history of domestic abuse, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions; and

   d. Brand's prior attempts to access Smith's residence and law enforcement's identification of him as a high-risk reoffender.

108. Hughes thus had actual knowledge of the specific risk to Plaintiffs, including Brand's direct threats to Smith, his admission of being at her address, his repeated violence against her, and his escalating pattern of violations while under IDOC supervision.

109. Despite this knowledge, Hughes failed to take reasonable protective measures. Specifically, she failed to:

    a.  Implement or enforce adequate policies, training, and supervision to ensure that parole officers conducted risk assessments and responded to violations;

    b.  Ensure prompt investigation and action on reports of threats, stalking, and parole violations;

    c.  Revoke or modify parole for high-risk repeat violators such as Brand;

    d.  Coordinate with law enforcement and the parole board to safeguard known victims;

    e.  Ensure staff were trained to recognize and respond to escalating domestic violence threats;

    f.  Discipline or retrain parole officers who ignored violations or failed to act on credible threats; and

    g.  Ensure timely victim notification of Brand's release status.

110. Hughes's failures affirmatively created or increased the danger to Plaintiffs by allowing Brand to remain free and unsupervised despite clear evidence of escalating threats and parole violations.

111. Hughes knew or should have known that her failure to act created a direct and foreseeable risk not only to Smith, but also to her children residing in the home Brand targeted.

112. Hughes's actions and omissions constituted deliberate indifference to a known, substantial risk of serious harm. Her conscious disregard for that risk violated Plaintiffs' substantive due process rights under the Fourteenth Amendment.

113. Hughes's deliberate indifference and failure to protect were a moving force in causing the constitutional deprivation. But for her failures to ensure supervision, enforcement, and

timely warnings, Brand would have been detained or otherwise prevented from attacking Plaintiffs.

114.    As a direct and proximate result of Hughes's unconstitutional conduct, Jayden was killed, Smith sustained life-threatening injuries, and Kameron suffered severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LATOYA HUGHES, in her individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, attorney's fees pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

**COUNT VIII**
**42 U.S.C. §1983 – State-Created Danger**
**Against LaToya Hughes, in Her Individual Capacity**

115.    Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

116.    To state a claim for state-created danger under the Fourteenth Amendment, Plaintiffs must show: (1) the defendant took affirmative acts that created or increased a danger the victim would not have otherwise faced; (2) the defendant acted with deliberate indifference to a known, substantial risk of serious harm; (3) the conduct was conscience-shocking; and (4) the conduct was a proximate cause of the harm suffered.

117.    At all relevant times, Hughes served as Acting Director of the IDOC, acting under color of state law. In that role, she held ultimate supervisory authority over parole officers and the systems responsible for monitoring parolees, including Brand.

118.    Hughes's failure to ensure adequate supervision and enforcement of Brand's parole conditions affirmatively created or increased the danger to Plaintiffs by allowing a violent

offender—well-documented for domestic abuse and repeated violations—to remain free and unsupervised despite escalating threats.

119.  Through IDOC's assumption of supervisory authority over Brand's parole, Hughes created the appearance that Brand was being monitored and controlled when in fact he was not, lulling Plaintiffs into a false sense of security as Brand escalated his threatening behavior.

120.  Hughes had actual and constructive knowledge of the substantial risk Brand posed to Plaintiffs, including:

   a.  Documented parole violations such as GPS interference and his admission to being at Smith's residence, as recorded in the February 4, 2024 Parole Violation Report;

   b.  Repeated warnings identifying Brand as an imminent threat to Smith and her children;

   c.  Brand's long history of violent domestic abuse against Smith, aggravated battery, home invasion, and repeated protective-order and parole violations; and

   d.  Brand's prior attempts to access Smith's home and law enforcement's identification of him as a high-risk reoffender.

121.  Despite this knowledge, Hughes acted with deliberate indifference by consciously disregarding the danger. Specifically, she failed to:

   a.  Implement or enforce adequate policies, training, and supervision to ensure parole officers conducted meaningful risk assessments;

   b.  Ensure that threats, stalking, and parole violations were promptly investigated and acted upon;

   c.  Revoke or modify parole for repeat violators and high-risk offenders like Brand;

   d.  Coordinate with law enforcement and the parole board to protect known victims;

    e.   Provide timely notification to Smith of Brand's release; and

    f.   Discipline or retrain staff who ignored violations, failed to act on credible threats, or neglected enforcement duties.

122.    Hughes knew or should have known that these failures created a direct and foreseeable risk not only to Smith but also to her children, including Jayden and Kameron, who resided with her at the targeted home.

123.    Hughes's conduct was conscience-shocking. Despite actual knowledge of Brand's escalating threats and violations, and despite possessing the authority to detain him or revoke his parole, she affirmatively allowed him to remain free. Her deliberate indifference, combined with the false assurance of supervision, reflects conduct that shocks the conscience and violates substantive due process.

124.    Hughes's affirmative acts and omissions were a proximate cause of the injuries suffered by Plaintiffs. But for her failures to ensure supervision, enforcement, and timely warnings, Brand would have been detained or otherwise prevented from attacking Smith and her children.

125.    As a direct and proximate result of Hughes's state-created danger, Plaintiffs' substantive due process rights under the Fourteenth Amendment were violated, resulting in Jayden's death, Smith's life-threatening injuries, and Kameron's severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LATOYA HUGHES, in her individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, attorney's fees pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

### COUNT IX
### Willful and Wanton Misconduct
### Against LaToya Hughes, in Her Individual Capacity

126. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

127. Under Illinois law, willful and wanton misconduct is conduct that either demonstrates an actual or deliberate intent to cause harm, or, if not intentional, reflects an utter indifference to or conscious disregard for the safety of others. A public official is liable when, with actual or constructive knowledge of a substantial risk of serious harm, she consciously disregards that risk and her conduct proximately causes injury.

128. At all relevant times, Hughes served as Acting Director of the IDOC, acting under color of state law. In that role, she held ultimate supervisory authority over parole officers and the systems responsible for monitoring parolees, including Brand.

129. Hughes had actual and constructive knowledge that Brand posed a substantial and imminent risk of serious harm to Plaintiffs, based on:

   a. His long history of violent domestic abuse, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions;

   b. His admission to being at Smith's residence, documented in the February 4, 2024 Parole Violation Report;

   c. His interference with GPS monitoring and other parole violations; and

   d. Multiple warnings identifying him as an imminent threat to Smith and her children.

130. Despite this knowledge and her authority to act, Hughes consciously disregarded the danger Brand posed by:

   a. Failing to ensure adequate supervision and monitoring after documented violations;

b.   Failing to revoke Brand's parole or detain him despite clear grounds, including direct contact with Smith and GPS tampering;

c.   Failing to implement corrective measures or heightened supervision despite her authority to do so;

d.   Failing to require parole officers to act on reports of escalating threats and violations; and

e.   Failing to notify or coordinate with Smith or law enforcement regarding Brand's release, leaving Smith uninformed until after he resumed contact.

131.   Hughes's conduct was not mere negligence but demonstrated utter indifference and conscious disregard for the safety of Plaintiffs.

132.   Hughes's willful and wanton misconduct was a direct and proximate cause of Jayden's death, Smith's life-threatening injuries, and Kameron's severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LATOYA HUGHES, in her individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, and all other relief this Court deems just and proper.

**COUNT X**
**Negligence (Pled in the Alternative)**
**Against LaToya Hughes, in Her Individual Capacity**

133.   Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

134.   Under Illinois law, a defendant is liable for negligence where: (a) the defendant owed the plaintiff a duty of care; (b) the defendant breached that duty; (c) the plaintiff suffered actual harm; and (d) the defendant's breach was a proximate cause of the harm. Liability requires

that the harm was foreseeable and that a reasonably careful person in the defendant's position would have acted differently.

135. At all relevant times, Hughes served as Acting Director of the IDOC, acting under color of state law. In that role, she held ultimate supervisory authority over parole officers and the systems responsible for monitoring parolees, including Brand.

136. Hughes owed Plaintiffs a duty to exercise reasonable care in supervising, monitoring, and enforcing parole conditions for Brand, who had a well-documented history of domestic violence, aggravated battery, home invasion, and repeated parole and protective-order violations.

137. Hughes had actual and constructive knowledge that:

   a. Brand had a long, well-documented history of violent domestic abuse, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions;

   b. Brand was subject to a "No Victim Contact" parole condition prohibiting contact with Smith and had repeatedly violated it;

   c. Brand committed multiple parole violations after release, including trespassing at Smith's home, attempting to force entry, making threats, interfering with GPS monitoring, and admitting he was at Smith's address; and

   d. Law enforcement warnings and risk assessments identified Brand as an ongoing and imminent threat to Smith and her children.

138. Despite this knowledge, Hughes breached her duty of care by:

   a. Failing to revoke Brand's parole or detain him after documented violations, including direct contact with Smith and GPS tampering;

b. Failing to implement corrective action or heightened supervision despite her authority to do so;

c. Failing to require parole officers to act on repeated reports of violations and threats; and

d. Failing to notify or coordinate with Smith or law enforcement to protect her upon Brand's release, leaving her uninformed until after Brand resumed contact.

139. Hughes knew or should have known that her failure to enforce parole conditions, respond to violations, and act on credible threats created a foreseeable risk of harm to Plaintiffs.

140. As a direct and proximate result of Hughes's negligence, Jayden was killed, Smith sustained life-threatening injuries, and Kameron Miles severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LATOYA HUGHES, in her individual capacity, in an amount in excess of $75,000, plus costs, and such further relief as this Court deems just and proper.

## COUNT XI
### Intentional Infliction of Emotional Distress (IIED)
### Against LaToya Hughes, in Her Individual Capacity

141. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

142. Under Illinois law, a defendant is liable for intentional infliction of emotional distress ("IIED") where: (a) the defendant's conduct was extreme and outrageous; (b) the defendant intended to cause severe emotional distress or knew there was a high probability such distress would result; and (c) the conduct in fact caused severe emotional distress.

143. At all relevant times, Hughes served as Acting Director of the IDOC, acting under color of state law. In that role, she held ultimate supervisory authority over parole officers and the systems responsible for monitoring parolees, including Brand.

144. Hughes had actual and constructive knowledge that:

    a. Brand had a long history of domestic violence, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions;

    b. Brand was subject to a "No Victim Contact" parole condition with Smith, which he repeatedly violated;

    c. Brand committed multiple violations after release, including trespassing at Smith's home, attempting to force entry, making threats, interfering with GPS monitoring, and admitting to being at her residence; and

    d. Law enforcement warnings and risk assessments identified Brand as an imminent and ongoing threat to Smith and her children.

145. Despite this knowledge, Hughes engaged in extreme and outrageous conduct by:

    a. Failing to revoke Brand's parole or detain him after documented violations, including direct contact with Smith and GPS tampering;

    b. Failing to implement corrective action or enhanced supervision despite having both the authority and duty to do so;

    c. Failing to require parole officers to respond to escalating threats and violations; and

    d. Failing to notify or coordinate with Smith or law enforcement, leaving Smith unaware of Brand's release until he resumed contact.

146. Hughes's conduct was extreme and outrageous because it ignored repeated, specific warnings and credible evidence of imminent danger—including documented threats,

parole violations, GPS tampering, and Brand's own admissions—yet allowed him to remain unsupervised and able to reach Smith and her children.

147.    Hughes knew, or had a high probability of knowing, that her conduct would cause severe emotional distress to Plaintiffs, including the trauma of experiencing and witnessing the March 13, 2024 attack.

148.    As a direct and proximate result of Hughes's conduct, Jayden was killed, Smith suffered life-threatening injuries and severe emotional distress, and Kameron endured severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LATOYA HUGHES, in her individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, and all other relief this Court deems just and proper.

### COUNT XII
### Negligent Infliction of Emotional Distress (NIED) (Pled in the Alternative to IIED) Against LaToya Hughes, in Her Individual Capacity

149.    Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

150.    Under Illinois law, a defendant is liable for negligent infliction of emotional distress ("NIED") where: (a) the defendant owed the plaintiff a duty of care; (b) the defendant breached that duty; (c) the plaintiff suffered severe emotional distress; and (d) the breach was a proximate cause of the distress. Plaintiffs may recover where the emotional harm is so severe that a reasonable person could not be expected to endure it.

151.    At all relevant times, Hughes served as Acting Director of the IDOC, acting under color of state law. In that role, she held ultimate supervisory authority over parole officers and the systems responsible for monitoring parolees, including Brand.

152. Hughes owed Plaintiffs a duty to exercise reasonable care in supervising, monitoring, and enforcing parole conditions for Brand, who had a well-documented history of domestic violence, aggravated battery, home invasion, and repeated parole and protective-order violations.

153. Hughes had actual and constructive knowledge that:

    a. Brand had a long history of domestic violence, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions;

    b. Brand was subject to a "No Victim Contact" parole condition prohibiting contact with Smith, which he repeatedly violated;

    c. Brand committed multiple violations after release, including trespassing at Smith's home, attempting forced entry, making threats, tampering with GPS, and admitting he was at Smith's residence; and

    d. Law enforcement warnings and risk assessments identified Brand as an imminent and ongoing threat to Smith and her children.

154. Despite this knowledge, Hughes breached her duty of care by:

    a. Failing to revoke Brand's parole or detain him after documented violations;

    b. Failing to implement corrective action or increased supervision despite having the authority to do so;

    c. Failing to require parole officers to act on reports of threats and escalating violations; and

    d. Failing to notify or coordinate with Smith or law enforcement to protect her upon Brand's release, leaving her unaware until he resumed contact.

155.   Hughes knew or should have known that her failure to enforce parole conditions, respond to repeated violations, and act on credible threats created a foreseeable risk of severe emotional distress to Plaintiffs.

156.   As a direct and proximate result of Hughes's negligence, Jayden was killed, Smith sustained life-threatening injuries and severe emotional distress, and Kameron suffered severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LATOYA HUGHES, in her individual capacity, in an amount in excess of $75,000, plus costs, and such further relief as this Court deems just and proper.

### COUNT XII
### Wrongful Death – 740 ILCS 180/1 et seq.
### Against LaToya Hughes, in Her Individual Capacity

157.   Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

158.   At all relevant times, Hughes served as Acting Director of the IDOC, acting under color of state law. In that role, she held ultimate supervisory authority over parole officers and the systems responsible for monitoring parolees, including Brand.

159.   Hughes owed a duty of care not only to Smith but also to all persons she knew or should have known were foreseeably at risk from Brand's conduct—including Smith's children, such as Jayden, who resided with her at the address Brand repeatedly targeted.

160.   Hughes had actual and constructive knowledge that:

   a.   Brand had a long history of domestic abuse, aggravated battery, home invasion, and repeated violations of parole conditions and protective orders, including violence against Smith at her residence;

    b. Brand was subject to a "No Victim Contact" parole condition, which he repeatedly violated;

    c. On February 1, 2024, Brand attempted to force entry into Smith's home while Jayden and Kameron resided there;

    d. The February 4, 2024 Parole Violation Report documented Brand's violation as "stalking a known victim [Laterria]" at her residence, and Brand admitted to being at Smith's address; and

    e. Brand's escalating violations and attempts to access Smith's home posed a direct and foreseeable risk to her children, including Jayden.

161. Despite this knowledge and her authority to act, Hughes breached her duty of care by:

    a. Failing to revoke Brand's parole or detain him despite repeated violations, including direct contact with Smith and GPS tampering;

    b. Failing to implement corrective action or heightened supervision despite her authority to do so;

    c. Failing to require parole officers to act on reports of escalating threats and violations; and

    d. Failing to notify or coordinate with Smith or law enforcement to protect her and her children upon Brand's release.

162. Hughes knew or should have known that her failure to enforce parole conditions, respond to repeated violations, and act on credible threats created a foreseeable risk of harm to Smith and her children, including Jayden.

163. As a direct and proximate result of Hughes's wrongful acts, neglect, and breaches of duty, Jayden was fatally stabbed on March 13, 2024.

164.    As a further direct and proximate result, Jayden's next of kin—including Smith and Kameron—suffered pecuniary injuries, including loss of support, companionship, grief, sorrow, mental suffering, and funeral and burial expenses.

WHEREFORE, Plaintiff Laterria Smith, as Independent Administrator of the Estate of Jayden Perkins, demands judgment against Defendant LATOYA HUGHES, in her individual capacity, in an amount in excess of $75,000, plus costs, and all other relief this Court deems just and proper.

**COUNT XIV**
**Survival Action – 755 ILCS 5/27-6**
**Against LaToya Hughes, in Her Individual Capacity**

165.    Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

166.    At all relevant times, Hughes served as Acting Director of the IDOC, acting under color of state law. In that role, she held ultimate supervisory authority over parole officers and the systems responsible for monitoring parolees, including Brand.

167.    Hughes owed a duty of care not only to Smith but also to all persons she knew or should have known were foreseeably at risk from Brand's conduct—including Smith's children, such as Jayden, who resided with her at the repeatedly targeted address.

168.    Hughes had actual and constructive knowledge that:

a.    Brand had a long history of violent domestic abuse, aggravated battery, home invasion, and repeated parole and protective-order violations, including violence against Smith at her residence;

b.    Brand was subject to a "No Victim Contact" parole condition, which he repeatedly violated;

    c.  On February 1, 2024, Brand attempted to force entry into Smith's home, where Jayden and Kameron resided there, in direct violation of parole;

    d.  The February 4, 2024 Parole Violation Report documented Brand's violation as "stalking a known victim [Laterria]" and recorded his admission to being at Smith's residence; and

    e.  Hughes knew or should have known that Brand's escalating conduct and repeated attempts to access Smith's home created a direct and foreseeable risk to her children, including Jayden.

169.   Despite this knowledge and her authority to act, Hughes breached her duty of care by:

    a.  Failing to revoke Brand's parole or detain him after documented violations, including direct contact with Smith and GPS tampering;

    b.  Failing to implement corrective action or increased supervision despite her authority and duty to do so;

    c.  Failing to require parole officers under her supervision to respond to escalating threats and violations; and

    d.  Failing to notify or coordinate with Smith or law enforcement to protect her and her children upon Brand's release, leaving them unprotected.

170.   Hughes knew or should have known that her failure to enforce parole conditions, respond to repeated violations, and act on credible threats created a foreseeable risk of harm to Smith and her children, including Jayden.

171.   As a direct and proximate result of Hughes's wrongful acts, neglect, and breaches of duty, Jayden suffered conscious pain, terror, and emotional distress before his death on March 13, 2024.

172.    Jayden's Estate is entitled to recover all damages permitted under the Illinois Survival Act, including damages for pain and suffering, emotional distress, loss of life, lost opportunities, medical expenses, and funeral and burial costs.

WHEREFORE, Plaintiff Laterria Smith, as Independent Administrator of the Estate of Jayden Perkins, demands judgment against Defendant LATOYA HUGHES, in her individual capacity, in an amount in excess of $75,000, plus costs, and all other relief this Court deems just and proper.

### COUNT XV
### 42 U.S.C. § 1983 – Supervisory Liability
### <u>Against Donald Shelton, in His Individual Capacity</u>

173.    Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

174.    Under 42 U.S.C. § 1983, supervisory liability may be imposed where a supervisor's own actions or inactions were the moving force behind a constitutional violation. Liability arises when the supervisor either: (a) directly participated in the violation; or (b) had actual or constructive knowledge of a pattern of unconstitutional conduct by subordinates and demonstrated deliberate indifference through acquiescence, tacit approval, or failure to act.

175.    At all relevant times, Shelton served as Chair of the IPRB, holding ultimate responsibility for ensuring parole decisions were made in a lawful and constitutional manner that protected the public from dangerous offenders, including Brand.

176.    Rather than fulfilling this duty, Shelton presided over a flawed system that prioritized expediency over safety, allowed reckless parole decisions, and failed to hold subordinates accountable for unconstitutional practices—failures that directly enabled the release of Brand and the attack on Plaintiffs.

177. As Chair, Shelton had actual knowledge that:

    a. IPRB granted parole to high-risk violent offenders without meaningful risk assessments, safeguards, or post-release supervision;

    b. Parole decisions were made without proper consideration of an offender's history of violence, including protective-order and parole-condition violations;

    c. Subordinates, including Defendant Miller, made parole determinations that disregarded clear threats to specific victims; and

    d. IPRB members were not adequately trained to evaluate whether offenders posed continuing threats to known victims, including survivors of domestic violence.

178. Despite these deficiencies, Shelton failed to implement training, supervision, or corrective measures to prevent unconstitutional parole decisions. His deliberate indifference to systemic failures was not isolated but part of a continuous pattern that directly caused Brand's release.

179. Shelton's failure to act allowed Brand—a known violent repeat offender—to be released without safeguards, enabling him to stalk, threaten, and ultimately attack Smith and her children.

180. By failing to train IPRB members on constitutional and statutory mandates governing parole determinations, Shelton created an environment where dangerous offenders were released without meaningful review, violating the substantive due process rights of Plaintiffs and others.

181. Shelton's failure to supervise and discipline IPRB members fostered a culture of impunity, where reckless and indifferent parole decisions went unchecked and victims of domestic violence were left unprotected.

182.  Shelton's deliberate indifference to these systemic failures was a moving force behind the constitutional injuries suffered by Plaintiffs. His failure to supervise, train, and discipline IPRB members directly resulted in Brand's parole and the fatal attack on March 13, 2024.

183.  Shelton knew or should have known that his supervisory failures created a direct and foreseeable risk of harm to Smith and her children residing with her.

184.  Shelton's conduct was not mere negligence but a conscious disregard for Plaintiffs' constitutional rights and safety, constituting a violation of their substantive due process rights under the Fourteenth Amendment.

185.  Shelton's misconduct was so egregious and conscience-shocking that it provoked public outrage and his resignation from the IPRB.

186.  Shelton's supervisory failures were a substantial factor in causing the constitutional deprivations that resulted in Jayden's death, Smith's life-threatening injuries, and Kameron's severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant DONALD SHELTON, in his individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, attorney's fees pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

### COUNT XVI
### 42 U.S.C. § 1983 – Failure to Protect
### <u>Against Donald Shelton, in His Individual Capacity</u>

187.  Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

188.  Under the Fourteenth Amendment's Due Process Clause, liability under 42 U.S.C. § 1983 arises when state actors: (a) have actual knowledge of a substantial risk of serious harm to

a specific individual; (b) possess the authority and opportunity to act; (c) act with deliberate indifference by consciously disregarding that risk; and (d) whose deliberate indifference is a substantial factor in causing the constitutional deprivation. Liability also attaches when state actors affirmatively create or increase the danger, or when a special relationship imposes a duty to protect.

189.   At all relevant times, Shelton served as Chair of the IPRB, holding ultimate responsibility for ensuring parole decisions were made in a lawful and constitutional manner that protected the public from dangerous offenders, including Brand.

190.   Shelton had actual knowledge of the imminent danger Crosetti Brand posed to Plaintiffs. As Chair, Shelton had access to Brand's complete IDOC file, which documented:

   a.   Brand's extensive history of domestic violence against Smith, including multiple arrests and convictions;

   b.   An escalating pattern of stalking, harassment, and threats directed specifically at Smith;

   c.   Violations of parole conditions, including unauthorized contact with Smith and failures of supervision; and

   d.   Explicit threats Brand made to harm Smith and her family upon release; and

   e.   The fact that Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her.

191.   Despite actual knowledge of this specific and immediate threat, Shelton failed to exercise his authority to protect Plaintiffs. He had both the power and obligation to:

   a.   Intervene to prevent or delay Brand's release;

    b. Ensure protective measures and enhanced supervision were imposed as conditions of parole;

    c. Require heightened scrutiny of parole decisions involving repeat violent offenders; and

    d. Coordinate with law enforcement to notify Smith of Brand's release and ensure her protection.

192. Instead, Shelton acted with deliberate indifference by:

    a. Allowing Brand's parole to proceed without intervention or safeguards;

    b. Failing to exercise oversight over IPRB members making constitutionally deficient parole determinations; and

    c. Failing to implement policies to ensure that victims of violent offenders were notified and protected prior to release.

193. Shelton's failures were not inadvertent or negligent but a conscious disregard of a known, substantial risk of serious harm to specific, identifiable victims. His inaction created a constitutionally intolerable risk that Brand would act on his threats.

194. The risk to Smith and her children was specific, immediate, and well-documented. Shelton knew that Brand had violated protective orders, attempted to enter Smith's home, and escalated his threats directly against this family.

195. Shelton's deliberate indifference and failure to protect were a moving force behind the constitutional deprivation suffered by Plaintiffs. But for Shelton's inaction, Brand would have been prevented from carrying out the attack.

196. Shelton's misconduct was so egregious and conscience-shocking that it provoked public outrage and his resignation from the IPRB.

197.   As a direct and proximate result of Shelton's unconstitutional conduct, Jayden was killed, Smith sustained life-threatening injuries, and Kameron suffered psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant DONALD SHELTON, in his individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, attorney's fees pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

## COUNT XVII
### 42 U.S.C. § 1983 – State-Created Danger
### Against Donald Shelton, in His Individual Capacity

198.   Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

199.   To prevail on a state-created danger claim under the Fourteenth Amendment's Due Process Clause, Plaintiffs must show: (1) the defendant took affirmative acts creating or increasing a danger the victims would not have otherwise faced; (2) the defendant acted with deliberate indifference to a known, substantial risk of serious harm; (3) the conduct was conscience-shocking; and (4) the conduct was a proximate cause of the harm suffered.

200.   At all relevant times, Shelton served as Chair of the IPRB, holding ultimate responsibility for ensuring parole decisions were made in a lawful and constitutional manner that protected the public from dangerous offenders, including Brand.

201.   Through his affirmative acts and deliberate omissions, Shelton created and substantially increased the danger that Brand posed to Plaintiffs—a danger they would not have faced but for Shelton's conscience-shocking conduct.

202.   Shelton had actual knowledge of the specific and imminent danger Brand posed, including:

    a. Brand's extensive criminal history of domestic violence, aggravated battery, and home invasion;

    b. Brand's escalating stalking, harassment, and explicit threats against Smith;

    c. Brand's repeated parole violations, including unauthorized attempts to contact Smith;

    d. Brand's documented attempt to force entry into Smith's residence, demonstrating his ongoing intent to harm her family; and

    e. The fact that Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her.

203. Despite this knowledge, Shelton affirmatively created or enhanced the danger to Plaintiffs by:

    a. Approving Brand's parole release without ensuring meaningful risk assessment or protective measures;

    b. Failing to impose enhanced supervision conditions designed to protect Smith and her children;

    c. Allowing Brand's release despite overwhelming evidence of his ongoing dangerousness; and

    d. Presiding over and perpetuating a system that prioritized administrative expediency over the safety of known victims.

204. Shelton's conduct went far beyond mere negligence. His deliberate indifference to a substantial and specific risk of harm was conscience-shocking. By approving Brand's release despite his known threats and violent history, Shelton transformed Brand from a contained risk while incarcerated into an immediate and deadly danger to Plaintiffs.

205. The danger Shelton created was neither generalized nor speculative. Shelton knew that Brand had repeatedly targeted Plaintiffs, made explicit threats, and attempted to breach their home, yet facilitated his release without safeguards.

206. Shelton's actions shocked the conscience because:

    a. He had detailed knowledge of Brand's violent history and specific threats;

    b. He possessed the authority and opportunity to prevent or delay Brand's release;

    c. He chose to prioritize expediency over the safety of known victims; and

    d. His decision was so reckless and egregious that it provoked public outrage and his subsequent resignation.

207. But for Shelton's affirmative acts in approving Brand's release despite actual knowledge of the danger he posed, Plaintiffs would not have suffered these devastating injuries and loss.

208. As a direct and proximate result of Shelton's unconstitutional conduct, Jayden was killed, Laterria sustained life-threatening injuries, and Kameron suffered psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant DONALD SHELTON, in his individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, attorney's fees pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

**COUNT XVIII**
**Willful and Wanton Misconduct**
**Against Donald Shelton, in His Individual Capacity**

209. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

210. Under Illinois law, willful and wanton misconduct is conduct that either demonstrates an actual or deliberate intent to cause harm, or, if not intentional, reflects an utter indifference to or conscious disregard for the safety of others. A public official is liable when, with actual or constructive knowledge of a substantial risk of serious harm, she consciously disregards that risk and her conduct proximately causes injury.

211. At all relevant times, Shelton served as Chair of the IPRB, holding ultimate responsibility for ensuring parole decisions were made in a lawful and constitutional manner that protected the public from dangerous offenders, including Brand.

212. Shelton had actual and constructive knowledge that Brand posed a substantial and imminent risk of serious harm to Plaintiffs, based on:

   a. Brand's documented history of violent domestic abuse, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions;

   b. Brand's admission to being at Smith's residence, as documented in the February 4, 2024 Parole Violation Report before the Board at the time of hearing;

   c. Brand's interference with GPS monitoring and other parole violations;

   d. Multiple warnings identifying Brand as an ongoing and imminent threat to Smith; and

   e. The fact that Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her.

213. Despite this knowledge and his ultimate authority as Chair, Shelton consciously disregarded the escalating danger Brand posed by:

   a. Failing to ensure adequate supervision and monitoring of Brand after documented violations;

     b.  Failing to revoke Brand's parole or detain him following clear violations, including direct contact with Smith and GPS tampering;

     c.  Failing to implement corrective action or heightened supervision despite his authority and duty to do so;

     d.  Failing to require parole officers under his supervision to act on reports of escalating threats, thereby fostering a culture of indifference; and

     e.  Failing to ensure that Smith was timely notified of Brand's release, leaving her unaware until after he resumed contact.

214.   Shelton's conduct was not mere negligence but demonstrated utter indifference and conscious disregard for the safety of Plaintiffs. His refusal to act, despite detailed knowledge of the risks and his authority to prevent them, enabled Brand to continue his campaign of terror and ultimately carry out the fatal attack.

215.   Shelton's misconduct was so egregious and conscience-shocking that it provoked public outrage and his resignation from the IPRB.

216.   As a direct and proximate result of Shelton's willful and wanton misconduct, Jayden was killed, Smith sustained life-threatening injuries, and Kameron suffered severe psychological trauma.

     WHEREFORE, Plaintiffs demand judgment against Defendant DONALD SHELTON, in his individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, and such further relief as this Court deems just and proper.

### COUNT XIX
### Negligence (Pled in the Alternative)
### Against Donald Shelton, in His Individual Capacity

217.   Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

218. Under Illinois law, a defendant is liable for negligence where: (a) the defendant owed the plaintiff a duty of care; (b) the defendant breached that duty; (c) the plaintiff suffered actual harm; and (d) the defendant's breach was a proximate cause of the harm. Liability requires that the harm was foreseeable and that a reasonably careful person in the defendant's position would have acted differently.

219. At all relevant times, Shelton served as Chair of the IPRB, holding ultimate responsibility for ensuring parole decisions were made in a lawful and constitutional manner that protected the public from dangerous offenders, including Brand.

220. Shelton's duties as Chair included:

   a. Supervising and training IPRB members, including Defendant Miller, to properly evaluate parole risks, particularly for offenders with histories of domestic violence and parole violations;

   b. Implementing and enforcing policies for risk assessment, victim notification, and protective parole conditions for offenders posing foreseeable risks to specific individuals;

   c. Providing oversight of parole decisions to ensure reasonable care and attention to public safety; and

   d. Intervening to correct or prevent flawed parole decisions that posed foreseeable risks of harm to identifiable victims.

221. Shelton breached his duty of care by failing to exercise reasonable diligence in his supervisory capacity, including:

   a. Failing to adequately train and supervise IPRB members on risk assessment protocols for domestic violence offenders;

b. Failing to enforce policies requiring heightened scrutiny for parolees like Brand, who had documented histories of stalking, domestic abuse, and repeated violations;

c. Failing to establish victim notification procedures to ensure survivors of domestic violence were warned of an offender's release;

d. Failing to intervene when IPRB members made parole decisions that ignored clear warning signs and jeopardized victim safety; and

e. Failing to impose protective parole conditions on Brand despite his documented history of targeting Plaintiffs specifically.

222. Shelton knew or reasonably should have known that Brand posed a foreseeable risk of harm to Plaintiffs based on:

a. Brand's extensive history of domestic violence against Smith;

b. Brand's admission to being at Smith's address, as documented in the February 4, 2024 Parole Violation Report;

c. Brand's GPS tampering and other parole violations;

d. Multiple warnings identifying Brand as an ongoing threat to Smith; and

e. Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her.

223. A reasonably careful person in Shelton's position, with his knowledge and authority, would have recognized the substantial risk Brand posed and taken appropriate steps to prevent or mitigate that risk through proper supervision, training, and oversight.

224. Shelton's negligent acts and omissions were a proximate cause of the injuries suffered by Plaintiffs. But for his failure to exercise reasonable care, Brand would not have been released under conditions that allowed him to carry out his attack.

225. Shelton's negligence was so egregious and conscience-shocking that it provoked public outrage and his resignation from the IPRB.

226. As a direct and proximate result of Shelton's negligence, Jayden was killed, Smith sustained life-threatening injuries, and Kameron suffered severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant DONALD SHELTON, in his individual capacity, in an amount in excess of $75,000, plus costs, and such further relief as this Court deems just and proper.

### COUNT XX
### Intentional Infliction of Emotional Distress (IIED)
### Against Donald Shelton, in His Individual Capacity

227. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

228. Under Illinois law, a defendant is liable for intentional infliction of emotional distress ("IIED") where: (a) the defendant's conduct was extreme and outrageous; (b) the defendant intended to cause severe emotional distress or knew there was a high probability such distress would result; and (c) the conduct in fact caused severe emotional distress.

229. At all relevant times, Shelton served as Chair of the IPRB, holding ultimate responsibility for ensuring parole decisions were made in a lawful and constitutional manner that protected the public from dangerous offenders, including Brand.

230. Shelton had actual knowledge that Brand was a repeat violent offender with a documented history of:

   a. Domestic violence, aggravated battery, and home invasion;

   b. Repeated violations of protective orders;

    c. Parole violations, including admission to being at Smith's residence and interference with GPS monitoring; and

    d. Escalating threats and stalking behavior directed at Smith.

231. Despite this knowledge, Shelton failed to exercise his authority to prevent or delay Brand's parole release, to impose protective conditions, or to ensure adequate safeguards were in place to protect foreseeable victims.

232. Shelton's actions and omissions constituted extreme and outrageous conduct because they disregarded repeated, specific indicators that Brand posed a substantial risk of serious harm to identifiable individuals.

233. Shelton knew, or should have known, that proceeding with Brand's release under these circumstances created a high probability of causing severe emotional distress to Plaintiffs.

234. Shelton's conduct was so egregious and conscience-shocking that it led to his resignation from the IPRB following public outrage over this preventable tragedy, demonstrating his own acknowledgment of the extreme nature of his failures.

235. As a direct and foreseeable result of Shelton's extreme and outrageous conduct Jayden was killed, Smith sustained life-threatening injuries, and Kameron suffered severe psychological trauma.

    WHEREFORE, Plaintiffs demand judgment against Defendant DONALD SHELTON, in his individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, and such further relief as this Court deems just and proper.

## COUNT XXI
### Negligent Infliction of Emotional Distress (NIED) (Pled in the Alternative to IIED)
### <u>Against Donald Shelton, in His Individual Capacity</u>

236. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

237. Under Illinois law, a defendant is liable for negligent infliction of emotional distress ("NIED") where: (a) the defendant owed the plaintiff a duty of care; (b) the defendant breached that duty; (c) the plaintiff suffered severe emotional distress; and (d) the breach was a proximate cause of the distress. Plaintiffs may recover where the emotional harm is so severe that a reasonable person could not be expected to endure it.

238. At all relevant times, Shelton served as Chair of the IPRB, holding ultimate responsibility for ensuring parole decisions were made in a lawful and constitutional manner that protected the public from dangerous offenders, including Brand.

239. Shelton owed Plaintiffs a duty to exercise reasonable diligence in his supervisory role to ensure that parole decisions were made with appropriate safeguards to protect foreseeable victims from harm. This duty included ensuring that IPRB members were adequately trained, supervised, and held accountable, particularly in cases involving offenders with documented histories of domestic violence and parole violations.

240. Shelton breached his duty of care by failing to exercise reasonable diligence in his supervisory capacity, including:

    a. Failing to adequately train and supervise IPRB members, including Defendant Miller, on proper risk assessment for domestic violence offenders with histories of protective order and parole violations;

    b. Failing to implement or enforce policies requiring heightened scrutiny and safeguards for parolees such as Brand, who had a documented history of stalking, domestic abuse, and repeated violations;

    c.  Failing to establish procedures for reviewing parole violation reports and ensuring that decisions considered all available evidence, including admissions and GPS monitoring data;

    d.  Failing to intervene or provide oversight when subordinate IPRB members made parole decisions that ignored clear warning signs and violated established safety protocols; and

    e.  Failing to revoke Brand's parole or ensure his detention in response to clear violations, including his admission to being at Smith's residence and interference with GPS monitoring.

241.    Shelton knew or reasonably should have known that Brand posed a foreseeable risk of serious harm to Plaintiffs, based on:

    a.  Brand's extensive documented history of domestic violence against Smith;

    b.  Brand's admission to being at Smith's residence, as detailed in the February 4, 2024 Parole Violation Report;

    c.  Brand's interference with GPS monitoring and other documented violations;

    d.  Multiple warnings identifying Brand as an ongoing threat to Smith; and

    e.  Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her.

242.    A reasonably prudent person in Shelton's position, with his knowledge and supervisory authority, would have recognized the substantial risk Brand posed and taken appropriate steps to mitigate that risk through proper training, supervision, and oversight of the parole process.

243. Shelton's negligent acts and omissions were a proximate cause of the severe emotional distress and other injuries suffered by Plaintiffs. But for his failure to exercise reasonable care, Brand would not have been released under circumstances that enabled him to carry out his attack.

244. Shelton's negligence was so egregious and conscience-shocking that it led to his resignation from the IPRB following public outrage over this preventable tragedy, demonstrating his own acknowledgment of the extreme nature of his failures.

245. As a direct and foreseeable result of Shelton's negligence, Jayden Perkins was killed, Laterria Smith sustained life-threatening injuries, and Kameron Miles suffered severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant DONALD SHELTON, in his individual capacity, for compensatory damages in an amount in excess of $75,000, plus costs, and such further relief as this Court deems just and proper.

### COUNT XXII
### Wrongful Death – 740 ILCS 180/1 et seq.
### <u>Against Donald Shelton, in His Individual Capacity</u>

246. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

247. At all relevant times, Shelton served as Chair of the IPRB, holding ultimate responsibility for ensuring parole decisions were made in a lawful and constitutional manner that protected the public from dangerous offenders, including Brand.

248. Shelton owed a duty of care not only to Smith but also to all persons he knew or should have known were foreseeably at risk from Brand's conduct—including Smith's children, such as Jayden, who resided with her at the address Brand repeatedly targeted.

249.  Shelton had actual and constructive knowledge that:

    a.  Brand had a long history of domestic abuse, aggravated battery, home invasion, and repeated violations of parole conditions and protective orders, including violence against Smith;

    b.  Brand was subject to a "No Victim Contact" parole condition, which he repeatedly violated;

    c.  On February 1, 2024, Brand attempted to force entry into Smith's home, where Jayden and Kameron reside;

    d.  The February 4, 2024 Parole Violation Report documented Brand's violation as "stalking a known victim [Laterria]" at her residence, and Brand admitted being at Smith's address;

    e.  Brand's escalating violations and repeated attempts to access Smith's home posed a direct and foreseeable risk to her children, including Jayden; and

    f.  Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her.

250.  Despite this knowledge and his authority to act, Shelton breached his duty of care by:

    a.  Failing to exercise supervisory oversight to prevent or delay Brand's parole release despite repeated violations, including direct contact with Smith and GPS tampering;

    b.  Failing to ensure that adequate protective measures and risk assessments were implemented before any release decision;

    c.  Failing to train and supervise IPRB members, including Defendant Miller, to properly evaluate high-risk domestic violence cases; and

    d.  Failing to implement policies requiring coordination with law enforcement to protect identified victims and their families upon an offender's release.

251. Shelton knew or should have known that his failure to provide adequate supervision and oversight of the parole decision-making process, and his failure to ensure proper evaluation of Brand's escalating violations, created a foreseeable risk of harm to Smith and her children, including Jayden.

252. As a direct and proximate result of Hughes's wrongful acts, neglect, and breaches of duty, Jayden was fatally stabbed on March 13, 2024.

253. As a further direct and proximate result, Jayden's next of kin—including Smith and Kameron—suffered pecuniary injuries, including loss of support, companionship, grief, sorrow, mental suffering, and funeral and burial expenses.

WHEREFORE, Plaintiff Laterria Smith, as Independent Administrator of the Estate of Jayden Perkins, demands judgment against Defendant DONALD SHELTON, in his individual capacity, in an amount in excess of $75,000, plus costs, and all other relief this Court deems just and proper.

### COUNT XXIII
### Survival Action – 755 ILCS 5/27-6
### <u>Against Donald Shelton, in His Individual Capacity</u>

254. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

255. At all relevant times, Shelton served as Chair of the IPRB, holding ultimate responsibility for ensuring parole decisions were made in a lawful and constitutional manner that protected the public from dangerous offenders, including Brand.

256.    Shelton owed a duty of care not only to Smith but also to all persons he knew or should have known were foreseeably at risk from Brand's conduct—including Smith's children, such as Jayden, who resided with her at the address repeatedly targeted by Brand.

257.    Shelton had actual and constructive knowledge that:

    a.    Brand had a documented history of domestic abuse, aggravated battery, home invasion, and repeated violations of parole conditions and protective orders, including violence against Smith;

    b.    Brand was subject to a "No Victim Contact" parole condition, which he repeatedly violated;

    c.    On February 1, 2024, Brand attempted to force entry into Smith's home, where Jayden and Kameron resided, in direct violation of parole;

    d.    The February 4, 2024 Parole Violation Report documented Brand's violation as "stalking a known victim [Laterria]" and recorded his admission to being at Smith's residence;

    e.    Brand's escalating conduct and repeated attempts to access Smith's home created a direct and foreseeable risk to her children, including Jayden; and

    f.    Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her.

258.    Despite this knowledge and his authority to act, Shelton breached his duty of care by:

    a.    Failing to exercise supervisory oversight to prevent or delay Brand's parole release despite repeated violations, including direct contact with Smith and GPS tampering;

    b.   Failing to ensure adequate protective measures and risk assessments were implemented before approving release;

    c.   Failing to train and supervise IPRB members, including Defendant Miller, to properly evaluate high-risk domestic violence cases and respond to escalating violations; and

    d.   Failing to implement policies requiring coordination with Smith or law enforcement to protect her and her children upon Brand's release.

259.    Shelton knew or should have known that his failure to provide adequate supervision, oversight, and enforcement of parole conditions created a foreseeable risk of harm to Smith and her children, including Jayden.

260.    As a direct and proximate result of Shelton's wrongful acts, neglect, and breaches of duty, Jayden suffered conscious pain, terror, and emotional distress before his death on March 13, 2024.

261.    Jayden's Estate is entitled to recover all damages permitted under the Illinois Survival Act, including damages for pain and suffering, emotional distress, loss of life, lost opportunities, medical expenses, and funeral and burial costs.

WHEREFORE, Plaintiff Laterria Smith, as Independent Administrator of the Estate of Jayden Perkins, demands judgment against Defendant DONALD SHELTON, in his individual capacity, in an amount in excess of $75,000, plus costs, and all other relief this Court deems just and proper.

### COUNT XXIV
### 42 U.S.C. §1983 – Failure to Protect
### Against LeAnn Miller, in Her Individual Capacity

262.    Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

263. Under the Fourteenth Amendment's Due Process Clause, liability under 42 U.S.C. § 1983 arises when state actors: (a) have actual knowledge of a substantial risk of serious harm to a specific individual; (b) possess the authority and opportunity to act; (c) act with deliberate indifference by consciously disregarding that risk; and (d) whose deliberate indifference is a substantial factor in causing the constitutional deprivation. Liability also attaches when state actors affirmatively create or increase the danger, or when a special relationship imposes a duty to protect.

264. At all relevant times, Miller served as a Member of IPRB. In this role, Miller was responsible for conducting parole hearings, gathering and evaluating evidence, reviewing parole violation reports, and making recommendations concerning the release and supervision of offenders, including Brand.

265. Miller's responsibilities included administrative fact-gathering and procedural compliance, such as reviewing parole violation reports, considering GPS monitoring data, and ensuring that risk assessments and victim-protection procedures were followed.

266. Miller had actual knowledge of the substantial risk of serious harm to Plaintiffs, including:

    a. Brand's documented history of domestic abuse, aggravated battery, home invasion, and repeated protective-order and parole violations;

    b. Brand's admission to being at Smith's residence, where her children lived, as documented in the Parole Violation Report before the Board at the time of hearing;

    c. Brand's interference with GPS monitoring and other documented parole violations;

    d. Warnings identifying Brand as an imminent threat to Smith and her children; and

    e. Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her.

267. Despite this knowledge and her administrative responsibility to ensure compliance with risk-assessment and victim-protection procedures, Miller:

  a. Personally conducted Brand's parole hearing and recommended his release;

  b. Failed to obtain or consider victim input or testimony, despite being aware of Smith's reports and Brand's admissions;

  c. Accepted Brand's denials at face value and disregarded the Parole Violation Report and GPS data;

  d. Did not impose or recommend meaningful safeguards or heightened supervision as conditions of release; and

  e. Failed to follow established risk-assessment protocols and procedures intended to protect foreseeable victims.

268. Miller's actions and omissions constituted deliberate indifference to a known, substantial risk of serious harm to Plaintiffs. Her failure to follow procedures, review critical evidence, and implement safeguards affirmatively created and increased the danger to Plaintiffs.

269. Miller's conduct was not limited to a purely adjudicatory function. Her failures in fact-gathering, risk assessment, and procedural compliance fall outside the scope of absolute quasi-judicial immunity and are subject to qualified immunity analysis.

270. Miller's conduct was so egregious and conscience-shocking that it led to her resignation from the IPRB following public outrage over this preventable tragedy, demonstrating her own acknowledgment of the extreme nature of his failures.

271. As a direct and proximate result of Miller's deliberate indifference and failure to protect, Plaintiffs' substantive due process rights under the Fourteenth Amendment were violated.

272. As a direct and proximate result of Miller's unconstitutional conduct, Jayden was killed, Smith sustained life-threatening injuries, and Kameron suffered psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LEANN MILLER, in her individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, attorney's fees pursuant to 42 U.S.C. § 1988, and such further relief as this Court deems just and proper.

**COUNT XXV**
**42 U.S.C. §1983 – State-Created Danger**
**Against LeAnn Miller, in Her Individual Capacity**

273. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

274. To prevail on a state-created danger claim under the Fourteenth Amendment's Due Process Clause, Plaintiffs must show: (1) the defendant took affirmative acts creating or increasing a danger the victims would not have otherwise faced; (2) the defendant acted with deliberate indifference to a known, substantial risk of serious harm; (3) the conduct was conscience-shocking; and (4) the conduct was a proximate cause of the harm suffered.

275. At all relevant times, Miller served as a Member of IPRB. In this role, Miller was responsible for conducting parole hearings, gathering and evaluating evidence, reviewing parole violation reports, and making recommendations concerning the release and supervision of offenders, including Brand.

276. Miller took affirmative acts that created or increased the danger to Plaintiffs by:

   a. Personally presiding over Brand's parole hearing and recommending his release despite actual knowledge of his dangerousness;

b. Accepting Brand's denials without corroboration and failing to obtain testimony or input from Smith;

c. Recommending release without imposing meaningful safeguards, conditions, or heightened supervision; and

d. Proceeding without adequate investigation or adherence to established risk-assessment and victim-protection procedures.

277. Miller had actual knowledge of the substantial risk of serious harm to Plaintiffs, including:

a. Brand's documented history of domestic violence, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions;

b. Brand's admission to being at Smith's residence, as reflected in the February 4, 2024 Parole Violation Report;

c. Brand's repeated parole violations, including GPS tampering and violations of his "No Victim Contact" condition; and

d. Warnings identifying Brand as an imminent danger to Smith and her children; and

e. Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her.

278. Despite this knowledge, Miller acted with deliberate indifference by recommending Brand's release while disregarding victim reports, documented admissions, and clear evidence of risk.

279. Miller's actions shocked the conscience because:

a. She had detailed knowledge of Brand's violent history and specific threats

b. She possessed the authority and opportunity to prevent or delay Brand's release;

c. She chose to prioritize expediency over the safety of known victims; and

     d.  Her decision was so reckless and egregious that it provoked public outrage and her subsequent resignation.

280.    Miller's recommendation was a substantial factor in Brand's release and the subsequent attack on March 13, 2024. But for her actions, Brand would not have been released under those circumstances, and the attack likely would have been prevented.

281.    As a direct and proximate result of Miller's state-created danger, Plaintiffs' substantive due process rights under the Fourteenth Amendment were violated, resulting in Jayden's death, Smith's life-threatening injuries, and Kameron's severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LEANN MILLER, in her individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, attorney's fees pursuant to 42 U.S.C. § 1988, and for all other relief this Court deems just and proper.

## COUNT XXVI
### Willful and Wanton Misconduct
### <u>Against LeAnn Miller, in Her Individual Capacity</u>

282.    Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

283.    Under Illinois law, willful and wanton misconduct is conduct that either demonstrates an actual or deliberate intent to cause harm, or, if not intentional, reflects an utter indifference to or conscious disregard for the safety of others. A public official is liable when, with actual or constructive knowledge of a substantial risk of serious harm, she consciously disregards that risk and her conduct proximately causes injury.

284.    At all relevant times, Miller served as a Member of IPRB. In this role, Miller was responsible for conducting parole hearings, gathering and evaluating evidence, reviewing

parole violation reports, and making recommendations concerning the release and supervision of offenders, including Brand.

285. Miller's duties included administrative fact-gathering and procedural compliance, such as reviewing parole violation reports, considering GPS monitoring data, and evaluating risk assessments. These responsibilities extended beyond purely adjudicatory decision-making and required adherence to established safeguards designed to protect potential victims.

286. Miller had actual knowledge of the substantial risk of harm to Plaintiffs, including:

   a. Brand's documented history of domestic violence, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions;

   b. Brand's admission to being at Smith's address, as documented in the Parole Violation Report available to the Board at the time of the hearing;

   c. Brand's interference with GPS monitoring and other parole violations;

   d. Warnings identifying Brand as a continuing and imminent threat to Smith and her children; and

   e. Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her.

287. Despite this knowledge, Miller:

   a. Personally presided over Brand's parole hearing and recommended his release;

   b. Failed to obtain victim input or testimony despite awareness of Smith's reports and Brand's admissions;

   c. Accepted Brand's denials without corroboration and disregarded the Parole Violation Report and GPS data;

      d.  Recommended release without imposing meaningful safeguards, conditions, or heightened supervision; and

      e.  Disregarded established parole board procedures intended to mitigate foreseeable risks.

288.    Miller's acts and omissions constituted willful and wanton misconduct by consciously disregarding a known, substantial risk of serious harm to Plaintiffs. Her failures to follow established procedures, review and weigh available evidence, and implement safeguards created and increased the danger to Plaintiffs.

289.    Miller's conduct was not confined to a quasi-judicial function; rather, her administrative failures in fact-gathering, risk assessment, and compliance fall outside the scope of absolute quasi-judicial immunity and are subject to qualified immunity standards.

290.    Miller's misconduct was so egregious and conscience-shocking that it provoked public outrage and her resignation from the IPRB.

291.    As a direct and proximate result of Miller's willful and wanton misconduct, Jayden was killed, Smith sustained life-threatening injuries, and Kameron suffered severe psychological trauma.

    WHEREFORE, Plaintiffs demand judgment against Defendant LEANN MILLER, in her individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, and for all other relief this Court deems just and proper.

### COUNT XXVII
### Negligence (Pled in the Alternative)
### <u>Against LeAnn Miller, in Her Individual Capacity</u>

292.    Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

293. Under Illinois law, a defendant is liable for negligence where: (a) the defendant owed the plaintiff a duty of care; (b) the defendant breached that duty; (c) the plaintiff suffered actual harm; and (d) the defendant's breach was a proximate cause of the harm. Liability requires that the harm was foreseeable and that a reasonably careful person in the defendant's position would have acted differently.

294. At all relevant times, Miller served as a Member of IPRB. In this role, Miller was responsible for conducting parole hearings, gathering and evaluating evidence, reviewing parole violation reports, and making recommendations concerning the release and supervision of offenders, including Brand.

295. Miller's duties included administrative fact-gathering and procedural compliance functions, extending beyond purely adjudicatory decision-making, and requiring adherence to established procedures and safeguards designed to protect foreseeable victims.

296. Miller owed Plaintiffs a duty to exercise reasonable care in reviewing, assessing, and making parole recommendations for Brand, who had a well-documented history of domestic violence, aggravated battery, home invasion, and repeated parole and protective-order violations.

297. Miller had actual knowledge that:

   a. Brand had a history of violent domestic abuse, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions;

   b. Brand had previously targeted and attempted to access Smith's residence, where her children resided, and had been identified by law enforcement as a high-risk reoffender;

c.  Brand's repeated violations and threats had been reported to law enforcement and parole officials, and he had been returned to custody for prior violations;

d.  Risk assessments, law enforcement reports, and court records identified Brand as an imminent danger;

e.  Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her;

f.  Brand interfered with GPS monitoring, as documented in the Parole Violation Report; and

g.  Brand admitted to Commander DeYoung that he was at Smith's residence, an admission documented in the Parole Violation Report, which was before the Board at the time of the hearing.

298.  Despite this knowledge, Miller breached her duty of care by:

a.  Recommending Brand's release without requiring victim input or testimony, and by accepting Brand's denials without corroboration;

b.  Failing to recommend or impose safeguards, conditions, or heightened supervision on Brand's release;

c.  Disregarding established risk assessments and IPRB procedures designed to mitigate foreseeable risks; and

d.  Failing to act on Brand's repeated parole violations, including his contacts with Smith, attempted forced entry into her home, interference with GPS monitoring, and his admission to being at her residence.

299. Miller's failures in fact-gathering, risk assessment, and compliance with established procedures extended beyond a quasi-judicial function and are therefore subject to qualified, not absolute, immunity.

300. Miller knew or reasonably should have known that her failure to properly evaluate risk, impose restrictions, or take corrective action created a foreseeable risk of harm to Plaintiffs.

301. Miller's misconduct was so negligent, egregious and conscience-shocking that it provoked public outrage and her resignation from the IPRB.

302. As a direct and proximate result of Miller's negligence, Jayden was killed, Smith suffered life-threatening injuries, and Kameron suffered severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LEANN MILLER in her individual capacity in an amount in excess of $75,000, plus costs, and for all other relief this Court deems just and proper.

## COUNT XXVIII
### Intentional Infliction of Emotional Distress (IIED)
### Against LeAnn Miller, in Her Individual Capacity

303. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

304. Under Illinois law, a defendant is liable for intentional infliction of emotional distress ("IIED") where: (a) the defendant's conduct was extreme and outrageous; (b) the defendant intended to cause severe emotional distress or knew there was a high probability such distress would result; and (c) the conduct in fact caused severe emotional distress.

305. At all relevant times, Miller served as a Member of IPRB. In this role, Miller was responsible for conducting parole hearings, gathering and evaluating evidence, reviewing

parole violation reports, and making recommendations concerning the release and supervision of offenders, including Brand.

306. Miller's responsibilities included administrative fact-gathering and procedural compliance, such as reviewing parole violation reports, considering GPS data, and evaluating risk assessments. These duties extended beyond purely adjudicatory decision-making and required her to ensure that established procedures and safeguards were followed to protect foreseeable victims.

307. Miller had actual knowledge that:

a. Brand had a history of violent domestic abuse, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions;

b. Brand had previously targeted and attempted to access Smith's residence, where her children resided;

c. Brand's repeated violations and threats had been reported to law enforcement and parole officials, and he had been returned to custody for prior violations;

d. Risk assessments, law enforcement reports, and court records identified Brand as an imminent danger and a high-risk reoffender;

e. Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her;

f. Brand interfered with GPS monitoring, as documented in the Parole Violation Report; and

g. Brand admitted to Commander DeYoung that he was at Smith's residence, an admission documented in the Parole Violation Report, which was before the Board at the time of the hearing.

308. Despite this knowledge and her responsibility to ensure compliance with risk assessment and victim protection procedures, Miller:

    a. Recommending Brand's release without requiring victim input or testimony, and by accepting Brand's denials without corroboration;

    b. Failing to recommend or impose safeguards, conditions, or heightened supervision on Brand's release;

    c. Disregarding established risk assessments and IPRB procedures designed to mitigate foreseeable risks; and

    d. Failing to act on Brand's repeated parole violations, including his contacts with Smith, attempted forced entry into her home, interference with GPS monitoring, and his admission to being at her residence.

309. Miller's failures in fact-gathering, risk assessment, and compliance with established procedures extended beyond a quasi-judicial function and are subject to qualified, not absolute, immunity.

310. Miller's conduct was extreme and outrageous in that it disregarded repeated, specific warnings and credible evidence of imminent danger to Plaintiffs, including documented threats, parole violations, GPS tampering, and Brand's admission to being at Smith's home.

311. Miller knew or should have known that her conduct would cause, or had a high probability of causing, severe emotional distress to Plaintiffs, including the trauma of witnessing and experiencing the attack on March 13, 2024.

312. Miller's conduct was so egregious and conscience-shocking that it led to her resignation from the IPRB following public outrage over this preventable tragedy, demonstrating her own acknowledgment of the extreme nature of her failures.

313. As a direct and proximate result of Miller's conduct, Jayden was killed, Smith suffered life-threatening injuries and severe emotional distress, and Kameron suffered severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LEANN MILLER, in her individual capacity, for compensatory and punitive damages in an amount in excess of $75,000, plus costs, attorney's fees pursuant to 42 U.S.C. § 1988, and for all other relief this Court deems just and proper.

### COUNT XXIX
### Negligent Infliction of Emotional Distress (NIED) (Pled in the Alternative)
### Against LeAnn Miller, in Her Individual Capacity

314. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

315. Under Illinois law, a defendant is liable for negligent infliction of emotional distress ("NIED") where: (a) the defendant owed the plaintiff a duty of care; (b) the defendant breached that duty; (c) the plaintiff suffered severe emotional distress; and (d) the breach was a proximate cause of the distress. Plaintiffs may recover where the emotional harm is so severe that a reasonable person could not be expected to endure it.

316. At all relevant times, Miller served as a Member of IPRB. In this role, Miller was responsible for conducting parole hearings, gathering and evaluating evidence, reviewing parole violation reports, and making recommendations concerning the release and supervision of offenders, including Brand.

317. Miller's responsibilities included administrative fact-gathering and procedural compliance, such as reviewing parole violation reports, considering GPS monitoring data, and evaluating risk assessments. These duties extended beyond purely adjudicatory decision-

making and required her to ensure that established procedures and safeguards were followed to protect foreseeable victims.

318. Miller owed Plaintiffs a duty to exercise reasonable care in reviewing, assessing, and making recommendations regarding Brand's parole, given his documented history of domestic violence, aggravated battery, home invasion, repeated violations of parole conditions, and prior parole violations.

319. At the time of Brand's parole hearing and release, Miller had actual knowledge, based on materials before the Board and her direct role in the hearing, that:

    a. Brand had a history of violent domestic abuse, aggravated battery, home invasion, and repeated violations of protective orders and parole conditions;

    b. Brand had previously targeted and attempted to access Smith's residence, where her children resided;

    c. Brand's repeated violations and threats had been reported to law enforcement and parole officials, and he had been returned to custody for prior violations;

    d. Risk assessments, law enforcement reports, and court records identified Brand as an imminent danger and a high-risk reoffender;

    e. Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her;

    f. Brand interfered with GPS monitoring, as documented in the Parole Violation Report; and

    g. Brand admitted to Commander DeYoung that he was at Smith's residence, an admission documented in the Parole Violation Report, which was before the Board at the time of the hearing.

320. Despite this knowledge, Miller breached her duty of care by:

   a. Recommending Brand's release without requiring victim input or testimony, and by accepting Brand's denials without corroboration;

   b. Failing to recommend or impose safeguards, conditions, or heightened supervision on Brand's release;

   c. Disregarding established risk assessments and IPRB procedures designed to mitigate foreseeable risks; and

   d. Failing to act on Brand's repeated parole violations, including his contacts with Smith, attempted forced entry into her home, interference with GPS monitoring, and his admission to being at her residence.

321. Miller's failures in fact-gathering, risk assessment, and procedural compliance went beyond purely adjudicatory functions and are subject to qualified, not absolute, immunity.

322. Miller knew or reasonably should have known that her failure to properly assess risk, impose restrictions, or take corrective action created a foreseeable risk of severe emotional distress to Plaintiffs.

323. Miller's conduct was so negligent, egregious and conscience-shocking that it led to her resignation from the IPRB following public outrage over this preventable tragedy, demonstrating her own acknowledgment of the extreme nature of his failures.

324. As a direct and proximate result of Miller's negligence, Jayden was killed, Smith suffered life-threatening injuries and severe emotional distress, and Kameron suffered severe psychological trauma.

WHEREFORE, Plaintiffs demand judgment against Defendant LEANN MILLER in her individual capacity in an amount in excess of $75,000, plus costs, and for all other relief this Court

deems just and proper.

## COUNT XXX
### Wrongful Death – 740 ILCS 180/1 et seq.
### Against LeAnn Miller, in Her Individual Capacity

325. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

326. At all relevant times, Miller served as a Member of IPRB. In this role, Miller was responsible for conducting parole hearings, gathering and evaluating evidence, reviewing parole violation reports, and making recommendations concerning the release and supervision of offenders, including Brand.

327. Miller owed a duty of care not only to Smith but also to all persons she knew or reasonably should have known were foreseeably at risk from Brand's conduct—including Smith's minor children, such as Jayden, who resided with her at the address repeatedly targeted by Brand.

328. Miller had actual and constructive knowledge that:

   a. Brand had a documented history of violent domestic abuse, aggravated battery, home invasion, and repeated violations of parole conditions and protective orders, including violence against Smith;

   b. Brand was subject to a "No Victim Contact" parole condition prohibiting contact with Smith;

   c. On February 1, 2024, Brand attempted to force entry into Smith's home, where Jayden and Kameron resided, in direct violation of parole;

   d.  The February 4, 2024 Parole Violation Report documented Brand's violation as "stalking a known victim [Laterria]" at her residence, and recorded his admission to being at Smith's address;

   e.  Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her;

   f.  Warnings identified Brand as an imminent danger to Smith and her children; and

   g.  Brand's repeated attempts to access Smith's home, his history of violence, and his February 1, 2024 attempted forced entry created a direct and foreseeable risk of harm to Smith's children, including Jayden.

329. Miller's responsibilities included not only adjudicatory decision-making but also administrative functions such as reviewing parole violation reports, considering GPS monitoring data, and evaluating risk assessments. These duties required her to ensure that established procedures and safeguards were followed to protect foreseeable victims and extended beyond purely adjudicatory functions.

330. Despite this knowledge and her administrative responsibilities, Miller breached her duty of care by:

   a.  Personally conducting Brand's parole hearing and recommending his release without requiring victim input or testimony, and by accepting Brand's denials without corroboration;

   b.  Failing to impose or recommend meaningful safeguards, conditions, or heightened supervision on Brand's release;

   c.  Disregarding established risk assessments and parole board procedures intended to prevent foreseeable harm; and

      d. Failing to respond to Brand's repeated parole violations, including documented contacts with Smith, attempted forced entry into her home, GPS tampering, and his admission to being at her address.

331. Miller's failures in fact-gathering, risk assessment, and procedural compliance went beyond purely adjudicatory functions and are subject to qualified, not absolute, immunity.

332. Miller knew or should have known that her failure to properly assess risk, impose restrictions, or take corrective action created a foreseeable risk of harm to Smith and her children, including Jayden.

333. Miller's conduct was so egregious and conscience-shocking that it led to her resignation from the IPRB following public outrage over this preventable tragedy, demonstrating her own acknowledgment of the extreme nature of her failures.

334. As a direct and proximate result of Miller's wrongful acts, neglect, and breaches of duty, Jayden was killed on March 13, 2024.

335. As a further direct and proximate result, Jayden's next of kin, including Smith and Kameron, suffered pecuniary injuries, including loss of support, companionship, grief, sorrow, and mental suffering, as well as funeral and burial expenses.

WHEREFORE, Plaintiff Laterria Smith, as the Independent Administrator of the Estate of Jayden Perkins, demands judgment against Defendant LEANN MILLER, in her individual capacity, in an amount in excess of $75,000, plus costs, and for all other relief this Court deems just and proper.

## COUNT XXI
### Survival Action – 755 ILCS 5/27-6
### Against LeAnn Miller, in Her Individual Capacity

336. Plaintiffs reallege and incorporate all paragraphs of the Factual Allegations as if fully set forth herein.

337. At all relevant times, Miller served as a Member of IPRB. In this role, Miller was responsible for conducting parole hearings, gathering and evaluating evidence, reviewing parole violation reports, and making recommendations concerning the release and supervision of offenders, including Brand.

338. Miller owed a duty of care not only to Smith, but also to all persons she knew or reasonably should have known were foreseeably at risk from Brand's conduct—including Smith's children, such as Jayden, who resided with her at the address repeatedly targeted by Brand.

339. Miller had actual and constructive knowledge that:

   a. Brand had a documented history of violent domestic abuse, aggravated battery, home invasion, and repeated violations of parole conditions and protective orders, including violence against Smith;

   b. Brand was subject to a "No Victim Contact" parole condition prohibiting contact with Smith, and Miller was aware of violations of this condition;

   c. On February 1, 2024, Brand attempted to force entry into Smith's home, where Jayden and Kameron resided, in direct violation of parole;

   d. The February 4, 2024 Parole Violation Report documented Brand's violation as "stalking a known victim [Laterria]" at her residence, and recorded his admission to being at Smith's address;

   e. Warnings identified Brand as an imminent danger to Smith and her children;

   f. Brand's parole would return him to the same geographic area as Smith, with no safeguards in place to protect her; and

g.   Brand's repeated attempts to access Smith's home, his history of violence, and his February 1, 2024 attempted forced entry created a direct and foreseeable risk of harm to Smith's children, including Jayden.

340.   Miller's responsibilities included not only adjudicatory decision-making, but also administrative functions such as reviewing parole violation reports, considering GPS monitoring data, and evaluating risk assessments. These duties required her to ensure that established procedures and safeguards were followed to protect foreseeable victims and extended beyond purely adjudicatory functions.

341.   Despite this knowledge and responsibility, Miller breached her duty of care by:

a.   Personally conducting Brand's parole hearing and recommending his release without requiring victim input or testimony, and by accepting Brand's denials without corroboration;

b.   Failing to impose or recommend meaningful safeguards, conditions, or heightened supervision on Brand's release;

c.   Disregarding established risk assessments and parole board procedures intended to prevent foreseeable harm; and

d.   Failing to respond to Brand's repeated parole violations, including documented contacts with Smith, attempted forced entry into her home, GPS tampering, and his admission to being at her address.

342.   Miller's failures in fact-gathering, risk assessment, and procedural compliance extended beyond purely adjudicatory decision-making and are subject to qualified immunity, not absolute immunity.

343.    Miller knew or should have known that her failure to assess risk, impose restrictions, or take corrective action created a foreseeable risk of harm to Smith and her children, including Jayden Perkins.

344.    Miller's conduct was so egregious and conscience-shocking that it led to her resignation from the IPRB following public outrage over this preventable tragedy, demonstrating her own acknowledgment of the extreme nature of her failures.

345.    As a direct and proximate result of Miller's wrongful acts, neglect, and breaches of duty, Jayden Perkins suffered conscious pain, terror, and emotional distress before his death on March 13, 2024.

346.    Jayden Perkins's Estate is entitled to recover all damages permitted under the Illinois Survival Act, including pain and suffering, emotional distress, loss of life, loss of future opportunities, medical expenses, and funeral and burial costs.

WHEREFORE, Plaintiff Laterria Smith, as the Independent Administrator of the Estate of Jayden Perkins, demands judgment against Defendant LEANN MILLER, in her individual capacity, in an amount in excess of $75,000, plus costs, and for all other relief this Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable as of right under Fed. R. Civ. P. 38 and 39.

Respectfully submitted,

**Laterria Smith, as the Independent Administrator of the ESTATE OF D. JAYDEN PERKINS, LATERRIA SMITH, in her individual capacity, and Laterria Smith on behalf of KAMERON MILES, a minor**

By: _____
     One of Her Attorneys

Date: September 26, 2025

Cozette A. Otubusin, Esq.
Paul O. Otubusin, Esq.
**OTUBUSIN & OTUBUSIN**
77 West Washington Street
Suite 1204
Chicago, Illinois  60602
cozette@otubusinlaw.com
drotubusin@otubusinlaw.com
(312) 251-1480
(312) 251-1481 (Fax)